## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | NO. 68138-9-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| SASSAN MEHRABIAN, | ) | ORDER GRANTING MOTION |
| | ) | TO PUBLISH OPINION |
| Appellant. | ) | |
| | ) | |

The respondent, State of Washington, has filed a motion to publish opinion filed March 25, 2013, and appellant Sassan Mehrabian has filed a reply to the motion. The court has determined that the motion should be granted. Now, therefore, it is

ORDERED that the opinion filed March 25, 2013, in the above-entitled case be published.

DATED this __6th__ day of June 2013.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON, )
                       )
           Respondent, )
                       )
             v. )
                       )
SASSAN MEHRABIAN, )
                       )
             Appellant. )
                       )

NO. 68138-9-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: March 25, 2013

2013 MAR 25 AM 9: 17

COURT OF APPEALS DIV I
STATE OF WASHINGTON
FILED

LAU, J. — A jury convicted Sassan Mehrabian of five counts of first degree theft, one count of attempted first degree theft, and one count of witness tampering. He appeals the judgment and sentence, claiming that (1) the trial court erred in finding that he unequivocally waived his right to counsel, (2) count I's "to convict" instruction improperly permitted the jury to convict him of acts committed beyond the statute of limitations, (3) insufficient evidence supports his theft convictions, and (4) two first degree theft convictions constitute the same criminal conduct. The State cross appeals the trial court's failure to include Mehrabian's 1992 first degree theft conviction in his offender score. Viewing the record as a whole, Mehrabian unequivocally waived his right to counsel. His remaining arguments lack merit. We affirm the jury convictions, but because the trial court improperly excluded Mehrabian's prior theft conviction from his offender score, we remand for resentencing consistent with this opinion.

## FACTS AND PROCEDURAL HISTORY

The City of Woodinville hired Sassan Mehrabian as its information technology (IT) manager in 2000. Mehrabian's supervisors, Deborah Knight and Jim Katica, were unaware that he ran a side business dealing in computer equipment. As IT manager, Mehrabian was solely responsible to buy and inventory new computer equipment. The City's extensive written purchasing policies required Mehrabian to provide three competitive bids and obtain approval from his supervisors before purchasing computer equipment. City policy prohibited employees from engaging in business with the City—either themselves or through their companies—without first disclosing the arrangement.

Despite this prohibition, Mehrabian bought computer equipment on eBay, using third party vendor GeekDeal to invoice himself at the City for similar equipment at a substantial markup. The City paid GeekDeal, which would then pass the money on to Mehrabian. On several occasions, Mehrabian either invented price quotes to support his purchases or forged invoices from GeekDeal. He also delivered to the City equipment inferior to what his supervisors approved, equipment not under warranty, or no equipment at all. The City discovered Mehrabian's scheme after he left City employment in 2008. The City contacted police when it inventoried its equipment and discovered discrepancies between the equipment it thought it had and the equipment it actually had.

The State charged Mehrabian by third amended information with five counts of first degree theft (counts I, IV, V, VII, and VIII), one count of attempted first degree theft

68138-9-I/3

(count VI), and one count of witness tampering (count III).[1] The jury convicted Mehrabian as charged on all counts.

## ANALYSIS

### Waiver of Right to Counsel

Mehrabian contends he was denied his state and federal constitutional right to counsel. The State responds that Mehrabian repeatedly demanded to represent himself and the request was unequivocal in light of the entire record.

### Relevant Facts

Mehrabian expressed his dissatisfaction with counsel on December 17, 2010, during a hearing before Judge Palmer Robinson. At that time, Mehrabian was represented by public defender Paul Vernon. Mehrabian told the court that he wanted a new lawyer or to hire private counsel because he and counsel did not agree on trial strategy and because counsel failed to obtain documents necessary to his defense. He also objected to his counsel's repeated requests for continuances. He stated that he lacked "confidence in . . . the public defenders' office trying [to] represent [him]." Judge Robinson denied Mehrabian's request to dismiss Vernon as counsel but made no ruling on whether Mehrabian could hire private counsel.

On February 25, 2011, Mehrabian appeared before Judge Ronald Kessler with retained counsel Jon Zulauf. Mehrabian requested that Zulauf be allowed to substitute for appointed counsel Vernon. Vernon joined in Mehrabian's request, stating that his relationship with Mehrabian was "problematic" and would only get worse at trial. Judge Kessler granted the motion and continued the trial date to enable Zulauf to prepare but

---

[1] Mehrabian does not challenge his witness tampering conviction on appeal.

-3-

also warned Mehrabian that "[t]here will be no other[] [substitutions of counsel]." The case proceeded to trial before Judge Richard Eadie in May 2011. Shortly after trial began, the court granted the defense's motion for mistrial due to a death in Zulauf's family. At another hearing before Judge Eadie on June 28, 2011, Zulauf indicated that Mehrabian wished to discharge counsel and proceed pro se. Judge Eadie conducted an extensive colloquy regarding Mehrabian's request. During the colloquy, Mehrabian answered "yes" when the court asked if he wanted to represent himself at trial. Judge Eadie warned Mehrabian that he had no constitutional right to standby counsel. When asked why he wanted to proceed pro se, Mehrabian explained that he knew the case better than anyone else did. He stated:

> All the intricacies involved with this case is known to me and me only because I've studied those 900-something pages, page-by-page, and I know them by heart because I've had close to two years to study them. And as the Court is aware, I had every intention for Mr. Zulauf to represent me, but those few days I noticed that Mr. Zulauf is missing out on many of those little details that I wholeheartedly believe that are crucial during the question and answer procedures. And it was rather nerve-wracking for me to sit here and see Mr. Zulauf not asking those appropriate questions. . . . And honestly, with my financial resources completely depleted because of this case for three and a half years, you know, shattering my life, not being able to work a full-time job, you know, at any place . . . so that's the only option that I'm left with.

Judge Eadie asked Mehrabian whether he knew he could have counsel appointed at public expense. Mehrabian responded that had no faith in, and did not want, a public defender. Specifically, he stated:

> I started with that, unfortunately I didn't see the . . . the ethical and dedication on my attorney's behalf for putting a battle for my side of the story. He was far more interested in entering into some sort of plea bargain than anything else. And, you know, through my investigation I found out that's what the Public Defender does. They just do, you know, primarily do plea bargains. So I lost my faith in Mr. Vernon.

He continued, "The Public Defenders don't put up a fight, you know, that Defendants expect from their attorneys."

Judge Eadie advised Mehrabian that he would be better off with a lawyer and strongly urged him not to represent himself. Judge Eadie then asked, "Now in light of the penalties that you might suffer if you were found guilty and in light of all of the difficulties of representing yourself, is it still your desire to represent yourself and give up your right to be represented by a lawyer?" Mehrabian responded, "Yes, Your Honor, at this time." The court found that Mehrabian "knowingly and voluntarily waived his right to Counsel" and granted his request to proceed pro se. Mehrabian signed a waiver of counsel.

A short time later, Judge Eadie again asked Mehrabian whether he truly wanted to represent himself. At that point, Mehrabian was less sure:

> I want to be really honest. Up to today I was determined to be . . . to go that pro se. But after listening to you I'm not quite sure to be honest with you. And it's a difficult case as, you know, you understand that I'm at a crossroads in my life that I cannot make, you know, definite decisions at this time.

The State then expressed concern that Mehrabian's request to represent himself was equivocal. After further colloquy and discussion with Zulauf, Mehrabian asked to proceed pro se with Zulauf as standby counsel. The court repeatedly asked Mehrabian what he wanted to do and he consistently said he wanted to proceed pro se with Zulauf as standby counsel. See Clerk's Papers (CP) at 239 ("RE [Richard Eadie]: Okay. Mr. Mehrabian? If Mr. Zulauf does stay on as standby Counsel, do you want to represent yourself at this time? SM [Sassan Mehrabian]: Yes, Your Honor."); CP at 240 ("RE: Well my understand[ing] is, Mr. Mehrabian, that you want to represent yourself and you're firm in that, but . . . And are you firm in wanting to represent yourself? SM: Yes,

Your Honor. Yes. RE: As opposed to going back to the Office of Public Defense? SM: Yes, Your Honor. Absolutely."); CP at 240 ("RE: And . . . do you still want to represent yourself? SM: Yes, Your Honor, I do. . . . RE: And your option is you want to represent yourself at this time, is that correct? SM: Yes. Yes please.").

The court granted Mehrabian's request and appointed Zulauf as retained standby counsel. Judge Eadie handwrote on Mehrabian's waiver form, "Jon Zulauf is appointed standby counsel." At that point, the court found Mehrabian's "waiver of counsel to be knowingly, intelligently and voluntarily made."

Two weeks later, on July 13, the parties appeared before Judge Ronald Kessler for a scheduling hearing. Zulauf indicated that Mehrabian was not happy with his representation and he was not being paid for his services as standby counsel. Mehrabian told the court he preferred to have Zulauf as standby counsel, but if Zulauf could not be paid at public expense, "that's fine, as long as I can have somebody at standby with me." Judge Kessler advised Mehrabian that he did not have a right to standby counsel. Judge Kessler allowed Zulauf to withdraw as standby counsel because he was not being paid.

Judge Kessler then told Mehrabian that because he did not have a right to standby counsel, the court was not going to order such appointment at public expense. The judge said, "I'm telling you this right now because this may have some impact on whether or not you choose to continue representing yourself." Mehrabian responded that he lacked financial resources to retain an attorney and thought his best option was to ask the Office of Public Defense about his options. Judge Kessler granted Mehrabian a week-long continuance to reconsider whether he wanted to continue pro se and directed him to discuss with the Office of Public Defense whether it would

-6-

appoint him standby counsel without a court order. Judge Kessler also told Mehrabian to find out if he was eligible for a public defender in the event he decided not to continue self representation.

A week later, on July 20, Mehrabian told the court he had chosen not to meet with the Office of Public Defense. "[S]ince I've been there before, I decided not to test the tested waters . . . between now and trial they defect and come up with some standby counsel, fine. Otherwise, I'm going to go pro se." Judge Kessler clarified, "You will continue pro se." Mehrabian answered, "[O]n my own. Yes, Your Honor." Judge Kessler told Mehrabian he could retain standby counsel on his own if he wanted to.

Two weeks later, the parties appeared at a discovery hearing before Judge Beth Andrus. Judge Andrus asked Mehrabian if he was sure he wanted to proceed pro se. He responded:

> At this point in time, I can't afford and I think Mister Zulauf did me a huge disservice by um basically requesting a mistrial based on false pretenses . . . .
>
>  . . . .
> . . . . I cannot afford a different uh, you know, a stand-by and I have to – I am trying every avenue that I possibly can to find somebody to go pro bono, but I'm not sure if I can find at this point in time.

The prosecutor explained Mehrabian's waiver of counsel history to the court. When the court asked whether Mehrabian was permitted to change his mind about proceeding pro se, Mehrabian stated, "[T]o add to the [prosecutor's] comments is that um I was not interested to have a public defender to be representing me as an attorney and that's what I expressed to the Court and um Judge Kessler."

During pretrial proceedings, the trial judge inquired whether all parties were "satisfied that [Mehrabian] was properly permitted to represent himself." Report of Proceedings (RP) (Sept. 1, 2011) at 4. The State indicated its satisfaction, and

-7-

Mehrabian voiced no concerns. Later, during pretrial, Mehrabian stated that he was "baffled by this whole process" and the court responded, "Well, you know, it's because you went pro se and it's because you don't have a lawyer and you don't know the rules of evidence. And I'm not surprised that you're baffled." RP (Sept. 1, 2011) at 69. Mehrabian did not refute the court's statement. Several times Mehrabian told the court why he had dismissed his attorney and chosen to proceed pro se.

At the beginning of trial, the court told Mehrabian:

> I can't help you. I'm not going to cut you slack because you're not an attorney. I don't want you to whine about the fact you're not an attorney. You made a choice, you're stuck with it, you're held to the standard of an attorney.

RP (Sept. 7, 2011) at 169. Mehrabian responded, "Yeah." RP (Sept. 7, 2011) at 169.

In closing argument, Mehrabian again referred to his choice to represent himself:

> I've always believed that the truth shall set you free and that's why I'm here. That's why I represented myself. I've gone through two attorneys – three attorneys and finally decided the best thing to do is just to come out and say it the way it is and see what happens.

RP (Sept. 15, 2011) at 966.

<u>Analysis</u>

Mehrabian contends he was denied his state and federal constitutional right to counsel. He argues he "never made an unequivocal request to proceed pro se." Appellant's Br. at 13. The State responds that Mehrabian repeatedly demanded to represent himself and the request was unequivocal in light of the entire record.

A defendant has a constitutional right to proceed without counsel as long as his constitutional right to counsel is knowingly, voluntarily, and intelligently waived. <u>Faretta v. California</u>, 422 U.S. 806, 807, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975); <u>City of Bellevue v. Acrey</u>, 103 Wn.2d 203, 208-09, 691 P.2d 957 (1984). The preferred method

-8-

for determining the validity of a waiver of the right to counsel is "a court's colloquy with the accused on the record detailing at a minimum the seriousness of the charge, the possible maximum penalty involved, and the existence of technical, procedural rules governing the presentation of the accused's defense." State v. Silva, 108 Wn. App. 536, 539, 31 P.3d 729 (2001).

> To protect defendants from making capricious waivers of counsel, and to protect trial courts from manipulative vacillations by defendants regarding representation, we require a defendant's request to proceed in propria persona, or pro se, to be unequivocal. Once an unequivocal waiver of counsel has been made, the defendant may not later demand the assistance of counsel as a matter of right since reappointment is wholly within the discretion of the trial court.

State v. DeWeese, 117 Wn.2d 369, 376-77, 816 P.2d 1 (1991). A defendant's waiver of counsel "must be unequivocal in the context of the record as a whole." State v. Modica, 136 Wn. App. 434, 441, 149 P.3d 446 (2006) (emphasis added), aff'd, 164 Wn.2d 1001, 175 P.3d 1093 (2007).

We review a trial court's decision on a request to proceed pro se for an abuse of discretion. State v. Breedlove, 79 Wn. App. 101, 106, 900 P.2d 586 (1995). The pro se defendant has no absolute right to standby counsel. DeWeese, 117 Wn.2d at 379.

The record as a whole amply demonstrates that the trial court properly accepted Mehrabian's valid waiver of his constitutional right to counsel in this case. Mehrabian tried to dismiss his appointed counsel and, when the court refused, he hired Zulauf. When that relationship proved unsatisfactory, he chose to represent himself, initially with Zulauf assisting as standby counsel. When the court granted Zulauf's request to withdraw, it allowed Mehrabian to retain different standby counsel, ask the Office of Public Defense about appointment of standby counsel, or change his mind regarding self representation and have new counsel appointed at public expense. While

Mehrabian preferred to have private standby counsel, he could not afford it, and he repeatedly refused the services of the public defender. In the context of the entire record, Mehrabian made an unequivocal request to proceed pro se.

In arguing that his request to proceed pro se was equivocal, Mehrabian characterizes his waiver of the right to counsel as a "conditional waiver" dependent on the appointment of standby counsel. Appellant's Br. at 4. He correctly notes that he told Judge Eadie he wished to proceed pro se with Zulauf as standby counsel—a request that Judge Eadie granted. But Mehrabian's claim that Judge Kessler "was unaware that the waiver was conditional" when he allowed Zulauf to withdraw as standby counsel is unsupported by the record. Appellant's Br. at 4. Judge Kessler had a copy of the waiver of counsel Judge Eadie signed, which indicated that Zulauf was standby counsel. As noted above, Judge Kessler (1) advised Mehrabian he had no right to standby counsel and told him that might influence whether he wanted to continue pro se, (2) directed Mehrabian to consult with the Office of Public Defense regarding appointment of standby counsel and eligibility for a public defender, and (3) gave Mehrabian a week to consider his options. After the week-long continuance, Mehrabian told the court he did not want a public defender and wanted to continue pro se. He reaffirmed his position to Judge Andrus two weeks later.

Citing United States v. Kienenberger, 13 F.3d 1354 (9th Cir. 1994), State v. Woods, 143 Wn.2d 561, 23 P.3d 1046 (2001), and State v. Stenson, 132 Wn.2d 668, 940 P.2d 1239 (1997), Mehrabian argues that "a request to proceed pro se accompanied by an indication that the request [is] occasioned by the defendant's dissatisfaction with counsel [is] equivocal." Appellant's Reply Br. at 3-4. Those cases are distinguishable. In Kienenberger, the defendant was dissatisfied with his court-

-10-

68138-9-I/11

appointed counsel and "continued to insist that he wanted to represent himself, but that he wanted 'advisory' counsel to assist him on procedural matters." Kienenberger, 13 F.3d at 1356. The court held that while the defendant repeatedly "requested that he be 'counsel of record,' his requests were always accompanied by his insistence that the court appoint 'advisory' or 'standby' counsel to assist him on procedural matters." Kienenberger, 13 F.3d at 1356. Thus, the defendant's requests were equivocal. Kienenberger, 13 F.3d at 1356. In contrast, Mehrabian did not demand standby counsel every time he affirmed he was proceeding pro se. He stated he would like to have standby counsel but was informed he had no right to such counsel, and he ultimately decided not to pursue his options in the Office of Public Defense.

In Woods, the defendant objected to the trial court's grant of his counsel's motion for a continuance. Woods, 143 Wn.2d at 586. On appeal, he argued he was denied his right to proceed pro se based on the following exchange with the trial court:

> [DEFENSE COUNSEL]: . . . . I think the only effective date we can ask for right now is the 5th of May of '97.
> THE DEFENDANT: Your Honor, you know, I will be — I will be prepared to proceed with-with this matter here without counsel come October 21st.
> THE COURT: All right. You understand you have the right to do that.
> THE DEFENDANT: Yes.
> THE COURT: Counsel, have you discussed this with your client?
> [DEFENSE COUNSEL]: No. We have not discussed that point at all. It's a surprise to me.
> THE DEFENDANT: I've — I've already consented to one continuance, Your Honor. And they-they have done nothing but grossly misuse that time there. And I feel if — if they was [sic] granted a second continuance, it — it would be treated in the same manner, Your Honor.
> THE COURT: All right. Thank you.

Woods, 143 Wn.2d at 587 (alterations in original) (quoting VRP at 13-14). Our Supreme Court held that the defendant's statement "merely revealed the defendant's displeasure with his counsel's request to continue the trial." Woods, 143 Wn.2d at 587.

-11-

This expression of frustration did not constitute an unequivocal request to proceed pro se. Woods, 143 Wn.2d at 587. Similarly, in Stenson, the defendant—21 days into jury selection on a death penalty charge—moved to appoint new counsel or, in the alternative, to proceed pro se, arguing that his counsel failed to vigorously represent him. Stenson, 132 Wn.2d at 730-31, 735-36. The trial court denied his motion, and he again asked to represent himself, stating, "'I do not want to do this but the court and the counsel that I currently have force me to do this.'" Stenson, 132 Wn.2d at 739. The court denied his request: "'At this point in time I find that the motion is not timely made and I also find based upon your indications that you really do not want to proceed without counsel.'" Stenson, 132 Wn.2d at 740 (emphasis omitted). Viewing the record as a whole, the court found:

> [A]lmost all of the conversation between the trial judge and the Defendant concerned his wish for different counsel. He repeatedly discussed which new counsel should be assigned. He explained he had contacted a number of attorneys and had asked for permission to talk with his newly-selected counsel. He told the trial court he did not want to represent himself but that the court and his counsel had forced him to do that. More importantly, the Defendant did not refute the trial court's final conclusion that he "really [did] not want to proceed without counsel." After the trial judge denied the request for substitution of new counsel and the request to proceed pro se, the Defendant, pursuant to a request from the trial court to put his request in writing, filed a written request which sought appointment of new lead counsel, retention of the existing second counsel, appointment of Mr. Leatherman as counsel for the penalty phase, and a continuance. In that request, the Defendant did not mention proceeding pro se. While the Defendant's request was conditional, it was also equivocal based on the record as a whole. The trial court's refusal to allow the Defendant to proceed pro se was not an abuse of its discretion.

Stenson, 132 Wn.2d at 742 (citation omitted).

In contrast to the above cases, the record here, when viewed as a whole, shows that Mehrabian unequivocally waived his right to counsel. He explained repeatedly to the court that he was dissatisfied with counsel and thought he was in the best position

to understand the evidence and defend the case. The court engaged Mehrabian in colloquies to determine whether he understood the nature and consequences of proceeding pro se. Mehrabian signed a written waiver informing him that the court was not required to appoint him standby counsel. Mehrabian had several opportunities well in advance of the trial date, as well as in court on the day of trial, to ask that counsel be reappointed or to seek appointment of standby counsel. Mehrabian never requested that counsel be appointed in any capacity. That Mehrabian chose to proceed pro se partly because he was dissatisfied with counsel does not constitute an equivocal request. See Modica, 136 Wn. App. at 442 ("[W]hen a defendant makes a clear and knowing request to proceed pro se, such a request is not rendered equivocal by the fact that the defendant is motivated by something other than a singular desire to conduct his or her own defense."); DeWeese, 117 Wn.2d at 378 ("Mr. DeWeese's remarks that he had no choice but to represent himself rather than remain with appointed counsel, and his claims on the record that he was forced to represent himself at trial, do not amount to equivocation or taint the validity of his Faretta waiver. These disingenuous complaints in Mr. DeWeese's case mischaracterize the fact that Mr. DeWeese did have a choice, and he chose to reject the assistance of an experienced defense attorney who had been appointed."). The trial court did not abuse its discretion in allowing Mehrabian to represent himself.

### Jury Instructions/Statute of Limitations

Mehrabian argues that we should reverse his first degree theft conviction as charged in count I because the "to convict" instruction permitted the jury to convict him "based solely upon acts committed beyond the statutory limitation period." Appellant's Br. at 16 (capitalization omitted).

-13-

"A criminal statute of limitations presents a jurisdictional bar to prosecution. It is not merely a limitation upon the remedy, but a 'limitation upon the power of the sovereign to act against the accused.'" State v. N.S., 98 Wn. App. 910, 914-15, 991 P.2d 133 (2000) (footnote omitted) (quoting State v. Glover, 25 Wn. App. 58, 61, 604 P.2d 1015 (1979)). "Because the criminal statute of limitations creates an absolute bar to prosecution, whether the State was barred by the statute of limitations from prosecuting a crime is an issue that may be raised for the first time on appeal." State v. Dash, 163 Wn. App. 63, 67, 259 P.3d 319 (2011).[2] If the to-convict instruction permits the jury to convict the defendant based solely on acts committed beyond the statutory limitation period, reversal is required. Dash, 163 Wn. App. at 65.

Here, the statute of limitations for first degree theft was three years at the time in question. See former RCW 9A.04.080(h) (2009).[3] The State charged Mehrabian with first degree theft (count I) by information filed on March 6, 2009. In the information, the State alleged that Mehrabian, "on or about March 7, 2006," wrongfully obtained control over the City's property (cash) by color and aid of deception. The information was later amended to allege that Mehrabian committed the crime "on or about April 17, 2006." The court instructed the jury:

> To convict the defendant of the crime of theft in the first degree, as charged in count I, each of the following four elements of the crime must be proved beyond a reasonable doubt:
> (1) That on or about April 17, 2006, the defendant, by color or aid of deception, obtained control over property of another;

---

[2] Mehrabian did not object to the jury instructions and raised no statute of limitations argument below. But as discussed in Dash, his argument is reviewable for the first time on appeal.

[3] The statute of limitations for felony theft committed by deception was extended to six years effective July 26, 2009. RCW 9A.04.080(d)(iv).

and
(2) That the property exceeded $1500 in value;
(3) That the defendant intended to deprive the other person of the property; and
(4) That this act occurred in the State of Washington.

Instruction 16 (emphasis added).

Here, both the information and the jury instructions recite a crime date of April 17, 2006. This crime date is within the three-year statute of limitations. The evidence established that prior to March 6, 2006, Mehrabian told GeekDeal to invoice the City for two items of computer equipment, he purchased the equipment through PayPal, and he was paid by GeekDeal. GeekDeal also invoiced the City prior to March 6, 2006. But the City did not issue a purchase order until March 7, 2006, and did not pay for the items (and thus part with its cash) until April 17, 2006. The jury found beyond a reasonable doubt that Mehrabian committed the crime on or about April 17, 2006.

Mehrabian relies on a line of cases regarding "continuing criminal impulse." See Dash, 163 Wn. App. at 68; State v. Reid, 74 Wn. App. 281, 290, 872 P.2d 1135 (1994); State v. Carrier, 36 Wn. App. 755, 757-58, 677 P.2d 768 (1984); State v. Vining, 2 Wn. App. 802, 808-09, 472 P.2d 564 (1970). This line of cases holds that when successive takings are the result of a single and continuing criminal impulse and are committed pursuant to a single criminal plan, the takings may constitute a single theft. Dash, 163 Wn. App. at 68; Reid, 74 Wn. App. at 290; Carrier, 36 Wn. App. at 757; Vining, 2 Wn. App. at 808-09. In such a case, the crime is "continuing" and is not completed until the criminal impulse is terminated. Dash, 163 Wn. App. at 68; Reid, 74 Wn. App. at 290. When a continuing criminal impulse exists, the statute of limitations does not begin to run until the crime is completed. Dash, 163 Wn. App. at 68; Reid, 74 Wn. App. at 290-91. "Whether a criminal impulse continues into the statute of limitations period is a

-15-

question of fact for the jury." <u>State v. Mermis</u>, 105 Wn. App. 738, 746, 20 P.3d 1044 (2001).

Mehrabian claims that under the cases noted above, "there are facts to establish that, as to Mehrabian, the entire crime of theft by deception was completed" prior to the statutory period. Appellant's Br. at 17. He argues that a jury could find that his "criminal impulse" was complete when GeekDeal invoiced the City prior to March 6, 2006—rather than when the City paid its bill on April 17, 2006—and that "this Court cannot determine whether the jury convicted Mehrabian based upon a continuing criminal impulse that extended into the statutory limitation period." Appellant's Br. at 17. Unlike the above cases, the State did not rely on the continuing criminal impulse doctrine. The State never alleged or argued that Mehrabian committed the offense constituting count I over a period of time that spanned the statutory limitation period. Instead, the State charged Mehrabian with committing the offense on a single date, April 17, 2006. The jury was instructed, consistent with the information, that it had to find beyond a reasonable doubt that Mehrabian committed the theft charged in count I on or about April 17, 2006. The to-convict instruction did not permit the jury to convict Mehrabian based solely on acts committed beyond the statute of limitations.

The State argues it charged Mehrabian with committing the crime on April 17, 2006, because the crime itself was not complete until the City parted with its money on that date. In his reply, Mehrabian argues that the State cites no case supporting its position and that the facts "establish that, as to Mehrabian, the entire crime of theft by deception was completed" prior to March 6, 2006. Appellant's Reply Br. at 4. By definition, theft by deception occurs when a person uses "color or aid of deception to <u>obtain control over the property or services of another</u> or the value thereof, with intent to

-16-

deprive him or her of such property or services." RCW 9A.56.020(1)(b) (emphasis added). A completed theft requires proof that the defendant actually obtained property belonging to another. State v. Barton, 28 Wn. App. 690, 695, 626 P.2d 509 (1981); see also State v. Goodlow, 27 Wn. App. 769, 773, 620 P.2d 1015 (1980) (distinguishing second degree theft from forgery for double jeopardy purposes; "theft conviction requires proof that the defendant actually gained control of the property") (emphasis added). Before April 17, 2006, Mehrabian had not actually obtained the City's property because the City did not part with its money until that date. Prior to April 17, Mehrabian had only committed attempted first degree theft by deception. The jury instructions properly directed the jury that April 17, 2006, was the date Mehrabian allegedly committed the crime charged in count I. Mehrabian's challenge to this instruction fails.

Sufficiency of the Evidence

Mehrabian argues that insufficient evidence supports his first degree theft convictions because the State failed to prove that the City relied on any deception when it purchased computer equipment from him. The State counters that sufficient evidence supports all of the convictions.

Evidence is sufficient to support a conviction if, viewed in the light most favorable to the State, it permits any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).[4] "A claim of insufficiency admits the truth of the State's evidence and all

---

[4] In determining whether sufficient evidence exists, the reviewing court determines not "whether it believes the evidence at trial established guilt beyond a reasonable doubt," but whether "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Green, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (emphasis omitted) (quoting Jackson v. Virginia, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)).

inferences that reasonably can be drawn therefrom." Salinas, 119 Wn.2d at 201. Circumstantial and direct evidence are equally reliable. State v. Moles, 130 Wn. App. 461, 465, 123 P.3d 132 (2005). We defer to the trier of fact on issues of conflicting testimony, witness credibility, and persuasiveness of the evidence. State v. Fiser, 99 Wn. App. 714, 719, 995 P.2d 107 (2000).

To convict Mehrabian of first degree theft, the State must prove beyond a reasonable doubt that he committed theft of more than $5,000 in property or services.[5] RCW 9A.56.030(1)(a). Because it charged Mehrabian with theft by color and aid of deception, the State was required to prove beyond a reasonable doubt that "[b]y color or aid of deception, [Mehrabian] obtain[ed] control over the property or services of another or the value thereof, with intent to deprive him or her of such property or services." RCW 9A.56.020(1)(b). "'By color or aid of deception' means that the deception operated to bring about the obtaining of the property or services; it is not necessary that deception be the sole means of obtaining the property or services." RCW 9A.56.010(4). "Deception" occurs when, among other things, the defendant knowingly "[c]reates or confirms another's false impression which the actor knows to be false[ ] or . . . [f]ails to correct another's impression which the actor previously has created or confirmed." RCW 9A.56.010(5)(a), (b).

"Deception" includes a broad range of conduct, including "not only representations about past or existing facts, but also representations about future facts, inducement achieved by means other than conduct or words, and inducement achieved by creating a false impression even though particular statements or acts might not be

---

[5] For count I only, the State had to prove Mehrabian committed theft of more than $1,500 in property or services. The law was subsequently modified to increase the first degree theft threshold from $1,500 to $5,000. See LAWS OF 2009, ch. 431, § 7.

false." State v. Casey, 81 Wn. App. 524, 528, 915 P.2d 587 (1996) (footnote omitted). The State must also prove that it relied on the defendant's deception, which "is established where the deception in some measure operated as inducement." Casey, 81 Wn. App. at 529. "The plain language of the [theft by color or aid of deception] statute does not require an express misrepresentation. The statute focuses on the false impression created rather than the falsity of any particular statement." State v. Wellington, 34 Wn. App. 607, 610, 663 P.2d 496 (1983).

Acquiring property by "aid of deception" requires that the victim relied on the deception. Casey, 81 Wn. App. at 529. If the victim would have parted with the property even if the true facts were known, there is no theft. State v. Renhard, 71 Wn.2d 670, 672-74, 430 P.2d 557 (1967). On the other hand, it is unnecessary that the deception be the sole reason that induced the victim to give up the property. Casey, 81 Wn. App. at 529. It is sufficient that the false representations were believed and relied on by the victim and in some measure operated to induce the victim to part with the property. State v. Zorich, 72 Wn.2d 31, 34, 431 P.2d 584 (1967).

At trial, the State presented evidence that Mehrabian was the sole owner of a corporation created in 1999 and known as Information Technology Solutions & Services Inc. (ITSSI). In early 2000, the City of Woodinville hired Mehrabian as an IT manager. During his City employment, Mehrabian was supervised first by city manager assistant Deborah Knight, and then by finance director Jim Katica.

As IT manager, Mehrabian was in charge of purchasing, maintaining, and inventorying all of the City's computer equipment. Katica testified that City employees were required to follow written policies and procedures when purchasing computer equipment. For purchases between $500 and $7,500, the procedures required

-19-

Mehrabian to obtain three quotes for the item and to accept the lowest bid. He would then obtain Katica's and another supervisor's approval to make the purchase. Between 2006 and 2008, Mehrabian was solely responsible for purchasing and inventorying computer equipment for the City's IT department.

Katica testified that he never knew Mehrabian had his own business, ITSSI, while employed by the City. Katica stated that the City's guidelines would permit such a business—if disclosed—at the department director's discretion. But Katica testified that the City would not permit an employee to use his personal business to sell items to the City and, in fact, he thought it was illegal for a person to be a City employee and also do business with the City. Katica never gave Mehrabian permission to buy nonwarranty items, purchase items on-line and bill them to the City through GeekDeal, or mark up the price of purchased equipment.

Knight similarly testified that she was not aware Mehrabian was the director of ITSSI and stated that had she known, she probably would not have approved any contracts between the City and ITSSI. Knight also testified that she would probably not have approved an invoice if "Mehrabian had decided to purchase a computer . . . himself and then bill it through a vendor that was not ITSSI at a markup." RP (Sept. 12, 2011) at 407. Knight and Katica both testified that they expected Mehrabian's computer purchases to be under warranty. As a rule, the City purchased no computer equipment through eBay because there was no guarantee that the equipment would be new or under warranty.

Because City policy prevented Mehrabian from buying computer equipment himself or through ITSSI and selling it directly to the City at a markup, he began purchasing equipment through eBay and selling it to the City through third-party vendor

68138-9-I/21

GeekDeal. Ron Moisant owned GeekDeal. Moisant testified that between 2005 and 2008, GeekDeal sold computer-related products. Moisant met Mehrabian when Mehrabian was a City employee in charge of buying the City's computer equipment. According to Moisant, Mehrabian told him he owned a

> value added reseller company, ITSSI; and that since he owned that company, the reason he needed somebody else to help make his purchases was because as an employee of the City he couldn't sell directly to the City. So, his company couldn't buy the product, so he needed another company that could actually sell it to the City since his company wasn't able to do that.

RP (Sept. 13, 2011) at 571.

Moisant testified that most of his transactions with Mehrabian "were, you know, I've bought this particular item and the City needs an invoice for it." RP (Sept. 13, 2011) at 572. Moisant further explained the financial arrangement Mehrabian proposed:

> [T]he arrangement that was explained to me that [Mehrabian] had with the City was that since he was buying it – his company was buying it, his company would – would have a profit margin built in. And so he would charge the City X amount and then the margin examine what he actually paid and what the City paid was the agreed, you know, commission or whatever you want to call it that he had with the City. And that's how he was paid for the – for the purchases that his company would make.

RP (Sept. 13, 2011) at 573. Moisant testified that typically Mehrabian would call or e-mail him, tell him what he had purchased, and request that Moisant invoice the City for that amount. Moisant assumed most of Mehrabian's purchases came through eBay.

Moisant also testified regarding how he profited from Mehrabian's proposal:

> I would bill [Mehrabian] for whatever amount he told me; then I would add on to that whatever the sales tax is that I was going to have to pay and a credit card fee . . . . And then a hundred bucks on top of that for my time.

RP (Sept. 13, 2011) at 574-75.

Moisant elaborated on the procedure Mehrabian used to sell equipment to the City:

-21-

Typically . . . [Mehrabian] would email me and say, Here is what I've bought for the City. Most of the time it seemed as though he already had it in his possession, and he would say, Here's the item, here's the amount, can you please create an invoice. I would generate a[n] invoice to the City, and then I'd . . . usually just give that to [Mehrabian].

[Mehrabian] would then submit . . . he'd just give me a credit card number, and then I would run it through on that credit card number. It was a City credit card usually. I think it was actually Jim Katica's City credit card that it would get run through on.

And then once the credit card would run . . . [Mehrabian] would come over and pick up a check. And I would pay him whatever the – the difference was. So, again, taking out what – what I'd pay in sales tax, the credit card processing fee that I'd have to pay and then the hundred bucks that I'd add on for me.

RP (Sept. 13, 2011) at 575-76.

Moisant testified that occasionally he personally ordered computer equipment to be sold to the City, and Mehrabian would come by and pick it up. However, Moisant testified that he never saw 60 to 70 percent of what Mehrabian bought. According to Moisant, "I was just creating the invoice that [Mehrabian] requested me to create for the City." RP (Sept. 13, 2011) at 580. But when shown copies of the invoices, Moisant testified he had not created some of them and was not aware of their existence at the time they were created and that they appeared to be forged by Mehrabian. Moisant also testified that the items Mehrabian purchased and had him create invoices for had no warranties.[6]

Regarding count I, the evidence showed that on February 16, 2006, Mehrabian e-mailed Moisant and told him to invoice the City $2,900 for a "Quantum DLTS 160/320GB SCSI Tape Backup Unit." Ex. 115. He also told Moisant to charge the City's credit card for the item that day and that he would give Moisant a purchase order the following day. On February 21, Mehrabian purchased the item on the internet for

---

[6] Moisant later told Katica about his arrangement with Mehrabian. Moisant asked Katica if that was his understanding of the situation, and Katica "said, No, it's not." RP (Sept. 14, 2011) at 637.

-22-

$920 using his ITSSI PayPal account. Mehrabian had the item shipped to a mailbox he maintained at Mail Plus in Bellevue. On February 28, GeekDeal invoiced the City for the item.

On March 3, 2006, Mehrabian again e-mailed Moisant and told him to charge the City's credit card $2,200 for an HP Compaq mobile workstation. The same day, GeekDeal invoiced the City for the item. GeekDeal then wrote a check to Mehrabian for $4,667.55: $2,900 for the tape backup unit, plus $2,200 for the workstation, less $200 ($100 per transaction for Moisant's fee) and a little more to cover the credit card fees. On March 6, Mehrabian purchased an HP Compaq computer on-line for $1,710, using his ITSSI PayPal account and again had the item shipped to his own mailbox. Mehrabian gave GeekDeal a purchase order for the computer on March 7. The purchase order was based on three price quotes Mehrabian provided to the City for the equipment, which claimed that GeekDeal's price quote was the lowest. But Moisant testified that GeekDeal never saw the equipment and merely invoiced for a price Mehrabian provided. Thus, Mehrabian invented the price quote from GeekDeal.

Finally, the City paid a credit card bill on April 17, 2006, containing the charges for the Quantum tape backup unit and the HP Compaq computer.

Counts IV, V, VII, and VIII (all first degree theft) involve similar conduct but with some differences. For count IV, the City thought it was purchasing an HP DL 580 dual core server and a Cisco PIX 525 firewall. No evidence indicated that Mehrabian ever purchased either item. Although the City received and paid GeekDeal invoices for both items, GeekDeal never invoiced the City and did not know the invoices existed until later—Mehrabian forged these invoices. When the City inventoried its equipment after Mehrabian's departure, only a much older firewall—that Mehrabian told Katica was

-23-

new—was located. That firewall was out of warranty. And instead of an HP DL 580 dual core server, only a DL 380 server was found. That server was also out of warranty.

For count V, the City thought it was purchasing an Aironet controller and another HP DL 580 server. No evidence showed that Mehrabian ever purchased either item. When the City inventoried its IT equipment, it located a used Aironet controller. The City failed to locate an HP DL 580 server, but found a lower quality model HP DL 380. As with count I, Mehrabian provided price quotes to the City showing that GeekDeal had the lowest price. Mehrabian invented the price quote.

For count VI, the City thought it was purchasing two HP DL 580 dual core servers, but no evidence showed Mehrabian purchased those items. The City's inventory found lower quality items. Mehrabian forged the GeekDeal invoice to the City for the items. When Moisant confronted Mehrabian about the forged invoice, Mehrabian told him that he was in a big hurry and could not wait for GeekDeal to prepare the invoice, so he created an invoice on his own.

For count VII, the City thought it was purchasing two Aironet wireless access points and paid $6,866.49. GeekDeal passed $5,959.88 of that price to Mehrabian. The City located only one of the access points.

Finally, for count VIII, the City thought it was purchasing a 24-port Cisco switch, a 48-port Cisco switch, and a Cisco Firewall Failover PIX 525. No evidence indicated that Mehrabian ever purchased these items. The City's inventory located a 24-port switch but was unable to locate a 48-port switch. The City found a Cisco PIX 525, but it was "a used item at the end of its life cycle" rather than a new item. RP (Sept. 13, 2011) at 508. Mehrabian gave the City three price quotes for the Cisco PIX 525, showing

-24-

GeekDeal as the low bidder. But Mehrabian told GeekDeal what amount to quote the City and later told GeekDeal to lower that amount by $100.

Shortly after Mehrabian left City employment in 2008, the City inventoried its computer equipment and discovered the discrepancies described above, including equipment that was older than the City thought and missing equipment. Gene Powers, a senior programmer for the City, helped conduct the inventory and noticed that many of the items for which discrepancies existed were purchased from GeekDeal. The City contacted the King County Sheriff's Department.

King County Sheriff's Detective Edward Ka investigated the case and interviewed Mehrabian. When Detective Ka told Mehrabian he thought it was inappropriate to be making a profit off the City, Mehrabian responded, "Well, you know, maybe it's unethical but it's not criminal." RP (Sept. 8, 2011) at 242.

Viewing the evidence in a light most favorable to the State, the evidence shows that Mehrabian billed the City on GeekDeal invoices for products he purchased elsewhere at a lower price. Katica indicated such a scheme constituted improper and unethical employee conduct. Mehrabian made questionable representations that the items came from GeekDeal and were legitimately purchased under warranty. The evidence also indicated that several of the items, when inventoried after Mehrabian's departure, were dissimilar and of lower quality than what Mehrabian claimed to have ordered. Mehrabian directed how much and who should be billed for items that were sold at a considerable markup. Mehrabian also fabricated or forged three of the invoices, again representing that GeekDeal was sending them.

The evidence sufficiently shows the City relied on Mehrabian's deceptive conduct. For each count of first degree theft, the evidence indicates that Mehrabian

-25-

sold property to the City in violation of the City's policies. Neither Knight nor Katica knew they were approving business deals with Mehrabian, and both said they probably would not have approved the deals had they known the true facts. Neither Knight nor Katica knew Mehrabian was enriching himself through these transactions, and both supervisors testified he did not have permission to do so.

By requiring a competitive bidding process, the City thought it was receiving the best price for the equipment it intended to purchase. It also assumed the products had warranties. Instead, it received equipment at a substantial markup over what Mehrabian paid for it, and the City's inventory revealed that several items were older and lower quality models, some items were missing, and some items were past their warranties.[7] The bids Mehrabian provided were invented—Mehrabian told GeekDeal the amounts to invoice the City, rather than GeekDeal quoting the City a price. In counts IV and VI, GeekDeal did not invoice the City. Instead, Mehrabian forged invoices and presented them to the City.

Mehrabian induced the City to pay out money by color or aid of deception: He purchased property himself, invoiced the City through GeekDeal at a substantial markup, invented price quotes, forged invoices, delivered an inferior product or failed altogether to deliver the purchased property, and enriched himself through the transactions. He created the impression that he was legitimately engaging in business with another company for the purchase and delivery of computer products. That false

---

[7] Mehrabian argues, "At best, the State's evidence was that items purchased off Ebay 'probably' had no warranty." Appellant's Br. at 19. He is incorrect. As discussed above, the City's inventory revealed that several items were older than expected and were out of warranty. And Moisant testified that GeekDeal did not warranty the items Mehrabian purchased and invoiced to the City.

-26-

impression caused the City to engage in business it would not otherwise have undertaken.[8] Overwhelming evidence supports the jury's verdicts.

### Same Criminal Conduct

Mehrabian contends that counts IV and V constituted the same criminal conduct for sentencing purposes. The State counters that although the thefts charged in counts IV and V were completed on the same day, Mehrabian's acts leading to the offenses occurred at different times and his intent to commit the two crimes was not continuous.

### Relevant Facts

Counts IV and V in the State's third amended information charged Mehrabian with first degree theft committed "on or about March 19, 2007." Both counts alleged that Mehrabian "did obtain control over such property belonging to the City of Woodinville, by color and aid of deception, [and] the value of such property did exceed $5,000."

The evidence presented at trial indicated that with respect to count V, Mehrabian's acts occurred in January 2007. Mehrabian e-mailed Moisant and told him to have GeekDeal invoice the City for an Aironet controller and an HP DL 580 server on January 11, 2007. GeekDeal invoiced the City on January 23, 2007 after receiving purchase orders from Mehrabian. The City paid its credit card bill for the equipment on March 19, 2007.

In contrast, count IV was supported by acts occurring several weeks later. Mehrabian provided GeekDeal with purchase orders for computer equipment dated

---

[8] Mehrabian claims that he followed the proper procurement procedures for items Woodinville needed and that "Woodinville would have purchased the products regardless of who was the lowest bidder." Appellant's Br. at 19. His claim about proper procurement is unsupported by the record, which indicates he fabricated quotes and forged invoices. And based on this record, it is pure speculation to assume that Woodinville would have purchased the items regardless of any deception by Mehrabian.

March 1, 2007. He also forged invoices from GeekDeal to the City dated March 5, 2007. The City again paid its bill with a separate check for the equipment on March 19, 2007.

At sentencing, Mehrabian argued counts IV and V constituted the same criminal conduct because the City paid the invoices on the same day. The court rejected Mehrabian's same criminal conduct argument:

> [I]n this case I think we have a series of sequential acts, two different intents on two different dates. And I don't think the fact that they were paid on the same date changes the dates of [Mehrabian's] intent. So I will find it is not the same criminal conduct.

RP (Dec. 20, 2011) at 1021.

Analysis

RCW 9.94A.589(1)(a) treats all "current and prior convictions as if they were prior convictions for the purpose of the offender score." That section, however, recognizes an exception: "[I]f the court enters a finding that some or all of the current offenses encompass the same criminal conduct then those current offenses shall be counted as one crime." RCW 9.94A.589(1)(a). "'Same criminal conduct' . . . means two or more crimes that require the same criminal intent, are committed at the same time and place, and involve the same victim." RCW 9.94A.589(1)(a). If any one of these elements is lacking, a finding of same criminal conduct is inappropriate. State v. Haddock, 141 Wn.2d 103, 110, 3 P.3d 733 (2000). In deciding whether crimes involve the same intent, we focus on whether the defendant's intent, objectively viewed, changed from one crime to the next. State v. Dunaway, 109 Wn.2d 207, 215, 743 P.2d 1237 (1987). This is determined, in part, by whether one crime furthered the other. State v. Vike, 125 Wn.2d 407, 411, 885 P.2d 824 (1994).

68138-9-I/29

We narrowly construe the same criminal conduct analysis. State v. Porter, 133 Wn.2d 177, 181, 942 P.2d 974 (1997); State v. Saunders, 120 Wn. App. 800, 824, 86 P.3d 232 (2004). And we review the trial court's determination on the issue of same criminal conduct for an abuse of discretion or misapplication of the law. Haddock, 141 Wn.2d at 110; State v. Tili, 139 Wn.2d 107, 122-23, 985 P.2d 365 (1999). A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or reasons. State v. Powell, 126 Wn.2d 244, 258, 893 P.2d 615 (1995).

Here, the trial court properly concluded that counts IV and V did not involve the same criminal conduct. The acts alleged in counts IV and V occurred at separate times (January versus March 2007). Despite the common check date, the City paid for separate fraudulent acts and Mehrabian's intent changed from one crime to the next. To determine whether a defendant's intent changed, we analyze whether crimes are sequential or continuous. State v. Grantham, 84 Wn. App. 854, 859, 932 P.2d 657 (1997). When a defendant "ha[s] the time and opportunity to pause, reflect, and either cease his criminal activity or proceed to commit a further criminal act," the crimes are sequential and not the same criminal conduct. Grantham, 84 Wn. App. at 859. Mehrabian completed the acts supporting count V in January. Several weeks later, he committed the acts supporting count IV. Intent was not continuous, and the City's payment of both bills on March 19, 2007, was merely coincidental. The trial court properly found his acts were sequential and did not constitute the same criminal conduct.

-29-

Cross Appeal

The State cross appeals the trial court's offender score calculation, arguing that the trial court erred in finding that Mehrabian had spent 10 crime-free years in the community since his last date of release from confinement and, thus, excluding his 1992 theft conviction from his offender score. Mehrabian responds that his 1992 case "washed out" and was not revived by a subsequent arrest on the "washed" case. Appellant's Reply Br. at 1-2.

Relevant Facts

At sentencing, the State argued that Mehrabian's offender score was 7. One of the seven points resulted from the State's inclusion of a prior first degree theft conviction in Mehrabian's offender score. The details of that theft conviction are as follows: Mehrabian was convicted of first degree theft in 1992. He was sentenced on January 15, 1993, to 60 days in custody with credit for 1 day served. Fifteen days were converted to community service with the remainder of the term served in electronic home detention. The court also imposed 12 months of community custody. The court required Mehrabian to report for his confinement period on February 12, 1993.

On May 30, 2003, the court held a sentence modification hearing under the same case number as the 1992 theft conviction. Mehrabian was in custody for that hearing due to a bench warrant that had been issued on January 30, 2003. The court found that Mehrabian willfully failed to pay legal financial obligations, ordered him to serve 8 days in custody with credit for 8 days served, and released him from jail.

At sentencing for the crimes at issue here, Mehrabian argued that his prior theft conviction "washed out" because, under RCW 9.94A.525(2)(b), he had spent 10 crime-

free years in the community after imposition of the sentence for that conviction. The trial court agreed and did not include that offense in Mehrabian's offender score.

Analysis

We review the trial court's offender score calculation de novo. State v. Mutch, 171 Wn.2d 646, 653, 254 P.3d 803 (2011). Resolution of the offender score question in this case turns exclusively on a question of statutory interpretation, which is also a question of law reviewed de novo. State v. Gray, 174 Wn.2d 920, 926, 280 P.3d 1110 (2012). "In interpreting a statute, our fundamental objective is to ascertain and carry out the legislature's intent." Gray, 174 Wn.2d at 926. Statutory interpretation begins with the statute's plain meaning. Lake v. Woodcreek Homeowners Ass'n, 169 Wn.2d 516, 526, 243 P.3d 1283 (2010). We discern plain meaning "from the ordinary meaning of the language at issue, the context of the statute in which that provision is found, related provisions, and the statutory scheme as a whole." State v. Engel, 166 Wn.2d 572, 578, 210 P.3d 1007 (2009). If a statute's meaning is plain on its face, we give effect to that plain meaning. State v. Armendariz, 160 Wn.2d 106, 110, 156 P.3d 201 (2007). Only if statutory language is ambiguous do we resort to aids of construction, including legislative history. Armendariz, 160 Wn.2d at 110-11. A provision is ambiguous if it is subject to more than one reasonable interpretation. Engel, 166 Wn.2d at 579.

First degree theft—the prior conviction at issue here—is a class B felony. RCW 9A.56.030(2). Under RCW 9.94A.525(2), certain prior convictions will not be counted in an offender score if sufficient time has elapsed between the last date of release from confinement and a subsequent conviction. This case concerns the proper interpretation of RCW 9.94A.525(2)(b), which governs when class B felony convictions may be included in a person's offender score. The statute provides in relevant part:

> Class B prior felony convictions . . . shall not be included in the offender score, if <u>since the last date of release from confinement (including full-time residential treatment) pursuant to a felony conviction</u>, if any, or entry of judgment and sentence, the offender had spent ten consecutive years in the community without committing any crime that subsequently results in a conviction.

RCW 9.94A.525(2)(b) (emphasis added).

On appeal the parties dispute the meaning of "the last date of release from confinement . . . pursuant to a felony conviction." RCW 9.94A.525(2)(b). The State contends that although Mehrabian was released from custody for the original crime in the spring 1993,[9] his most recent release from custody "pursuant to" that felony conviction was May 30, 2003, when Mehrabian was in custody for his failure to comply with financial obligations stemming from the original conviction. Mehrabian responds, "There is no support in the case law or statute for the notion that a conviction that has 'washed' can be revived by a subsequent arrest on the 'washed' case." Appellant's Reply Br. at 2.

We have interpreted "release from confinement . . . pursuant to a felony conviction," as used in RCW 9.94A.360(2), as encompassing release from confinement pursuant to community supervision violations on the subject felonies. State v. Blair, 57 Wn. App. 512, 789 P.2d 104 (1990). The version of the statute we interpreted in Blair contained language identical to the language at issue in Mehrabian's case:

> Class C prior felony convictions shall not be included in the offender score if, <u>since the last date of release from confinement (including full-time residential treatment) pursuant to a felony conviction</u>, if any, or entry of judgment and sentence, the offender had spent five consecutive years in the community without being convicted of any felonies.

---

[9] The record does not reveal when Mehrabian was released from custody pursuant to the original first degree theft sentence. According to the judgment and sentence for that conviction, Mehrabian was required to report for his term of confinement on February 12, 1993. Given his 60-day sentence, he was released on or before April 12, 1993.

Former RCW 9.94A.360(2) (1989) (emphasis added). In Blair, the offender had a prior 1981 class C felony conviction. Blair, 57 Wn. App. at 513-14. He received three years' probation and violated it twice, the latest violation occurring in 1987 for which he served 90 days in jail. Blair, 57 Wn. App. at 514. He subsequently committed the felonies that were the subject of his appeal. Blair, 57 Wn. App. at 513. The trial court determined that both prior convictions "washed out" under RCW 9.94A.360(2). Blair, 57 Wn. App. at 514. On appeal, we stated the legal issue as follows: "[D]oes incarceration pursuant to a probation violation interrupt the 5-year wash-out period for a class C felony?" Blair, 57 Wn. App. at 514.

We held in Blair that incarceration for a probation violation constitutes confinement pursuant to a felony conviction within the meaning of the statutory washout provision. Blair, 57 Wn. App. at 515-17. We relied on State v. Perencevic, 54 Wn. App. 585, 589, 774 P.2d 558 (1989), which interpreted the escape statute and "held that confinement for a community supervision violation was confinement 'pursuant to a conviction of a felony.'" Blair, 57 Wn. App. at 515 (quoting Perencevic, 54 Wn. App. at 589).[10] Thus, "[t]he trial court erred in ruling that confinement as a penalty for a probation violation would not as a matter of law interrupt the wash-out period for the underlying conviction." Blair, 57 Wn. App. at 517.

We see no reason to depart from our reasoning in Blair when interpreting the statute at issue here, whose relevant language is identical to the language at issue in

---

[10] See also In re Pers. Restraint of Higgins, 120 Wn. App. 159, 163-64, 83 P.3d 1054 (2004) (applying the rule that incarceration for a probation violation is confinement pursuant to the underlying felony).

Blair.[11] Blair analyzed the statute's plain language as follows:

> Indeed, the very language of the statute necessarily leads to the same conclusion. Confinement results from (1) the original conviction, which formerly could include terms of probation; and (2) the subsequent violation of probation conditions. In interpreting "pursuant to a felony conviction" under RCW 9.94A.360(2), there is no reason to disassociate the probation confinement from its underlying cause, the felony conviction. Each instance of the defendant's confinement must be considered. <u>Disregarding confinement due to probation violations would render superfluous "last date of release from confinement" under the statute.</u> It is a well-settled rule of statutory construction to give meaning to all words used.
>
> Moreover, "'Pursuant to' means 'in the course of carrying out: in conformance to or agreement with: according to.'" Therefore, "confinement pursuant to a felony conviction" includes confinement due to a probation violation since this confinement results "in the course of carrying out" and "according to" a felony conviction.

Blair, 57 Wn. App. at 515-16 (emphasis added) (footnotes omitted) (quoting Hanson v. Tacoma, 105 Wn.2d 864, 871, 719 P.2d 104 (1986) and Knowles v. Holly, 82 Wn.2d 694, 702, 513 P.2d 18 (1973)). Mehrabian was last released from confinement pursuant to the 1992 conviction in May 2003, when he served jail time for failing to pay financial obligations stemming from the 1992 conviction. Thus, his conviction did not "wash" and should have been included in his offender score. To hold otherwise fails to give effect to the word "last" in RCW 9.94A.525(2)(b)'s "last date of release from confinement" language, as the trial court here noted. See RP (Dec. 20, 2011) at 1021-

---

[11] RCW 9.94A.360, which we interpreted in Blair, was recodified as RCW 9.94A.525 by Laws 2001, chapter 10, section 6. The recodified language for class C felony convictions is substantially similar to the prior version, and the relevant language (underlined) is identical:

> [C]lass C prior felony convictions other than sex offenses shall not be included in the offender score if, <u>since the last date of release from confinement (including full-time residential treatment) pursuant to a felony conviction,</u> if any, or entry of judgment and sentence, the offender had spent five consecutive years in the community without committing any crime that subsequently results in a conviction.

RCW 9.94A.525(2)(c). And this underlined text is identical to the relevant statutory language in RCW 9.94A.525(2)(b), the subsection at issue in Mehrabian's case.

22 (interpreting the statute in Mehrabian's favor but noting "I am troubled because I think that doesn't give meaning to the word last."). The trial court improperly excluded Mehrabian's prior first degree theft conviction from his offender score calculation.[12]

## CONCLUSION

Because Mehrabian unequivocally waived his right to counsel and his remaining claims lack merit, we affirm his convictions but remand for resentencing consistent with this opinion.

WE CONCUR:

---

[12] Mehrabian argues that the legislature could not have intended for convictions that have "washed" to be revived by a subsequent arrest on the "washed" case. Appellant's Reply Br. at 2. We addressed a similar argument in Blair:

> It was obvious upon adoption of the [Sentencing Reform Act] that the wash-out provisions would apply to a large number of prior crimes involving terms of probation. If treating confinement for violation of such terms as interrupting the wash-out period was not desired, the Legislature could have codified this intent. We see nothing unfair to the defendant nor any conflict with the purposes of the SRA by giving the statutory language its natural interpretation.

Blair, 57 Wn. App. at 516-17. And as our Supreme Court explained in State v. Ervin, 169 Wn.2d 815, 825, 239 P.3d 354 (2010),

> Any lingering doubts about the correctness of [a party's] interpretation are allayed by the legislature's acquiescence in it. We presume the legislature is "familiar with judicial interpretations of statutes and, absent an indication it intended to overrule a particular interpretation, amendments are presumed to be consistent with previous judicial decisions."

(quoting State v. Bobic, 140 Wn.2d 250, 264, 996 P.2d 610 (2000)). Blair interpreted language identical to the language in RCW 9.94A.525(2)(b). Since the language we interpreted in Blair was recodified as RCW 9.94A.525 in 2001, the legislature has amended RCW 9.94A.525 nine times, but has in no way altered the language interpreted in Blair. See LAWS OF 2011, ch. 166, § 3; LAWS OF 2010, ch. 274, § 403; LAWS OF 2008, ch. 231, § 3; LAWS OF 2007, ch. 199, § 8; LAWS OF 2007, ch. 116, § 1; LAWS OF 2006, ch. 128, § 6; LAWS OF 2006, ch. 73, § 7; LAWS OF 2002, ch. 290, § 3; LAWS OF 2002, ch. 107, § 3. This legislative acquiescence in Blair's interpretation of the term strongly favors the State's interpretation of the statute.