IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 83339-1-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| TARYN M.K. REHN, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |

HAZELRIGG, J. — Taryn M.K. Rehn appeals her convictions for four counts of theft in the first degree after a jury trial. The jury found two aggravating factors for each count: (1) the defendant knew or should have known the victim was particularly vulnerable, and (2) the defendant used her position of trust to facilitate the crime. While Rehn asserts a number of errors on appeal, her challenge to the sufficiency of the evidence underlying her convictions is dispositive. Because there is insufficient evidence to sustain each of Rehn's convictions, we reverse without reaching the other assignments of error raised in briefing or her pro se statement of additional grounds for review.

Citations and pinpoint citations are based on the Westlaw online version of the cited material.

FACTS

Taryn Rehn was raised by her maternal grandmother, Emily Rehn.[1]  Emily had two children: Vicky Price (Rehn's mother) and Tami Mooers (Rehn's maternal aunt).  Emily and Rehn were very close; Emily paid for Rehn to attend private schools, contributed to her undergraduate and graduate education, helped her pay for an apartment, and assisted with various expenses throughout Rehn's life.  In 2010, Rehn moved back to Seattle from New York City.  At this point, Emily was in her 80s and Rehn assisted her with paying bills, attending medical appointments, yardwork, and other tasks as needed.  Emily gave Rehn $15,000 to help her purchase a condo in the area, but Rehn eventually moved in with Emily instead.

In 2003, Emily executed several estate planning documents, including a durable power of attorney and healthcare power of attorney.  She conveyed shared power of attorney to Tami and Rehn, giving them both equal power to transact financial matters.  There were several express powers and limitations, such as allowing Tami or Rehn to transfer assets to facilitate Medicaid qualification, and make gifts so long as they were below the annual exclusion amount pursuant to the Internal Revenue Code.  She also expressed a "strong preference to remain in [her] residence so long as possible" in her healthcare power of attorney.  In 2010, Emily updated some of her estate planning documents, creating a revocable living trust and placing her home in it.[2]  Emily was the initial trustee, Rehn would become

---

[1] Several witnesses share last names. For clarity, we refer to Taryn Rehn, the defendant, as "Rehn," and all others by their first names. No disrespect is intended.

[2] The Power of Attorney documents were not updated.

trustee if Emily became incapacitated, and Tami was the alternate if Rehn could not serve as trustee. In addition to her home, Emily's assets included three bank accounts at Wells Fargo and a Morgan Stanley investment account.

In 2012, Rehn filed paperwork with the State to create a non-profit limited liability company called Bright Elder Care (BEC). Rehn was listed as the director and registered agent, with Emily as secretary. The reported purpose of BEC was "[c]haritable, public service for underprivileged elderly." At the end of 2012, around $17,000 was moved from Emily's Morgan Stanley bank account to a Bank of America account in BEC's name. In 2013, another transfer of approximately $30,000 was made from Emily's Morgan Stanley bank account to a Bank of America account in BEC's name and around $25,000 was moved from Emily's Wells Fargo living trust account to a Bank of America account in BEC's name. In 2014, several checks from the United States Treasury, USAA, and for a settlement Emily received, were deposited in accounts held in Rehn's name. During this time, Emily began to experience increasing memory challenges and Rehn requested a neuro-psych evaluation. In August 2013, Emily's doctor signed a certification documenting Emily's incapacity, which enabled her to seek Veteran's Administration (VA) benefits. Rehn applied for benefits from the VA for Emily and established the required protective payee account for those benefits.

In 2013, a bank teller had concerns about activity on Emily's living trust account and spoke to Tami, who was a trustee on the account. Tami also discovered a quit claim deed signing Emily's home over to Rehn. Tami and her husband David Mooers were concerned; they contacted Adult Protective Services

(APS) and filed a petition for a guardianship over Emily. APS opened an investigation, interviewing Emily and Rehn and examining bank statements. Rehn claimed there was a verbal agreement between her and Emily, where Emily would pay her $56,000 per year and Rehn would provide in-home care pursuant to Emily's wish to remain in her own home.

In 2014, a professional guardian was appointed in response to Tami's petition. Tami moved Emily to an assisted living facility, where she resided until she died in 2018. In 2015, the Tacoma Police Department began investigating Rehn for financial exploitation, and a detective obtained search warrants for Emily and Rehn's bank accounts, including the living trust account. The State brought criminal charges against Rehn on February 21, 2018. As amended, the State ultimately filed four charges of theft in the first degree, each with two aggravating factors (knowledge of the victim's vulnerability and use of a position of trust to facilitate the offense).[3] The charging document did not name the victim, nor did the special verdict forms for the aggravators which were presented to the jury. After a trial, the jury convicted Rehn as charged and found both aggravating factors for each charge. The judge imposed an exceptional sentence of 36 months in prison by ordering the nine month sentence imposed on each count run consecutive to the others. Rehn was permitted to post $100,000 bond for her release pending appeal. Rehn timely appealed.

---

[3] Two other charges were dismissed pursuant to a pretrial motion under State v. Knapstad, 107 Wn.2d 346, 729 P.2d 48 (1986), after which the State amended the information.

ANALYSIS

I.      Statutory Framework: Theft by Deception Distinguished from Embezzlement

RCW 9A.56.020 contains separate definitions for the crime of theft. An individual may commit theft if they "wrongfully obtain or exert unauthorized control over the property or services of another," or if they "obtain control over the property or services of another" "[b]y color or aid of deception." RCW 9A.56.020(1)(a), (b). The first provision, exerting unauthorized control, "includes what was embezzlement under prior law." State v. Joy, 121 Wn.2d 333, 339, 851 P.2d 654 (1993).

"The chief distinction" between embezzlement and theft by deception "lies in the manner of acquiring possession of the property." State v. Smith, 2 Wn.2d 118, 121, 98 P.2d 647 (1939).[4] In an embezzlement case, the defendant "comes lawfully into the possession" of the property and it is then "fraudulently . . . appropriated," while in theft by deception "there is a trespass in the unlawful taking of the property." Id. Trespass "is essential to constitute" theft, but is not present in embezzlement. Id.

This court analyzed the distinction between the two crimes in its unpublished opinion in State v. McKinnon, No. 74008-3-I, slip op. at 7. While "[u]npublished opinions of the Court of Appeals have no precedential value and are not binding upon any court," we may accord them "such persuasive value as

---

[4] Smith analyzed a previous version of the statute, but "the elements of the different means have not materially changed—RCW 9A.56.020 merely rephrases and reorganizes the previous statute." State v. McKinnon, No. 74008-3-I, slip op. at 7 (Wash. Ct. App. Aug. 1, 2016) (unpublished), https://www.courts.wa.gov/opinions/pdf/740083.pdf.

the court deems appropriate" and may utilize them when "necessary for a reasoned decision." GR 14.1(a) and (c). McKinnon provides a helpful synthesis of existing case law for distinguishing embezzlement and theft by deception.

In McKinnon, the defendant "had lawful possession" of the homeowner's association's funds as its hired accountant. Slip op. at 11. Because he had lawful possession of the funds when he "misappropriated the funds to his personal use," the evidence supported a conviction for embezzlement, not theft by deception. Id. The court compared and contrasted McKinnon's case from several other cases:

| Comparisons in McKinnon | |
|---|---|
| Case | Comparison/Distinction |
| State v. Smith, 2 Wn.2d 118, 98 P.2d 647 (1939) | Smith managed a business and "had complete control" of the business's funds. The court held the State should have charged Smith with embezzlement because the funds were lawfully in his possession before the misappropriation. |
| State v. Johnson, 56 Wn.2d 700, 355 P.2d 13 (1960) | Johnson cashed insurance checks obtained after his co-defendant created false claim files and authorized payment. Because the co-defendant only had authority to order payment, and relied on other employees to execute them, he did not possess the funds and therefore larceny by deception was proper. |
| State v. Renhard, 71 Wn.2d 670, 430 P.2d 557 (1967) | Renhard was the president of a corporation and had sole authority to sign checks. The court held the State failed to prove deception was necessary to obtain the property because Renhard "had lawful control" of the funds that were misappropriated. Therefore, larceny by embezzlement was proper, rather than larceny by deception. |

| State v. Mehrabian, 175 Wn. App. 678, 308 P.3d 660 (2013) | Mehrabian worked for a city and owned a side business selling computer equipment. He improperly sold equipment to the city using third-party invoices, forging price quotations, and selling equipment at substantial markups. There, Mehrabian obtained control over city funds through deception by forging price quotations, submitting them to his supervisor, who would then purchase the equipment. The court held theft by deception was proper. |
|---|---|

Here, Rehn was charged with theft by color or aid of deception, not theft by exertion of unauthorized control. As the three-year statute of limitations had passed, Rehn could not have been convicted of theft by exertion of unauthorized control. Another key distinction between embezzlement and theft by deception is the statute of limitations. Under former RCW 9A.04.080, theft by deception had a six-year statute of limitations, while embezzlement had only a three-year statute of limitations. Former RCW 9A.04.080(1)(d)(iv), (1)(h) (LAWS OF 2017, ch. 266, § 9). The State may have made a strategic decision to pursue charges under theft by deception, despite the fact that embezzlement more closely fit the facts of the case, because the statute of limitations for embezzlement had lapsed.[5]

With this statutory background in mind, we turn to Rehn's sufficiency challenge.

---

[5] The State relied on Rehn's act of creating BEC on January 1, 2012 and the use of that LLC to transfer Emily's funds beginning in December 2012 as the earliest allegedly unlawful act. Charges were not filed until February 21, 2018.

II.      Sufficiency of Evidence

Rehn argues there was insufficient evidence to convict her of theft by deception because the State failed to present any evidence Emily was deceived. At oral argument, Rehn confirmed that her sufficiency challenge centers on the element of reliance.

"Sufficient evidence exists to support a conviction if any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt." State v. Briejer, 172 Wn. App. 209, 217, 289 P.3d 698 (2012). We view the evidence in the light most favorable to the State, admitting the truth of the State's evidence and drawing all reasonable inferences in favor of the State. Id. "Circumstantial evidence and direct evidence are equally reliable." Id. We defer to the jury "on issues of conflicting testimony," witness credibility, "and the persuasiveness of the evidence." Id.

The court's instructions to the jury were based on pattern instructions and defined the thefts alleged by the State as occurring "by color or aid of deception, to obtain control over the property of another, or the value thereof, with intent to deprive that person of such property." The instructions further define "by color or aid of deception" as circumstances where "the deception operated to bring about the obtaining of the property." Jurors were further instructed that deception means "an actor knowingly creates or confirms another's false impression that the actor knows to be false," "fails to correct another's impression that the actor previously has created or confirmed," of the actor "prevents another from acquiring information material to the disposition of the property involved."

To demonstrate the victim relied on the deception, the State must show the victim would not have parted with the property if they knew the true facts. Mehrabian, 175 Wn. App. at 701. While the deception need not be the sole reason the victim parted with the property, the deception must "in some measure operate[] to induce the victim to part with the property." Id. For example, in Mehrabian, two city employees testified they did not know "they were approving business deals with Mehrabian, and both said they probably would not have approved the deals had they known the true facts." Id. at 707. In State v. Casey, five separate victims testified that they "relied in whole or in part upon a deceptive representation by Casey when deciding to accept his offer," and therefore there was sufficient evidence of reliance. 81 Wn. App. 524, 530–31, 915 P.2d 587 (1996). In contrast, in State v. Briejer, there was insufficient evidence to support a theft by deception conviction because the defendant "did not conceal" information about his ankle injury when submitting information for his claim to the Department of Labor and Industries. 172 Wn. App. 209, 221–22, 289 P.3d 698 (2012).

Here, the State argues Rehn created a false impression she was spending Emily's money to meet Emily's needs, deceptively used a "web of accounts" and a "misleadingly titled corporation" to "exert control over the trust funds." It also argues the "sophisticated scheme made it difficult for the co-designated attorney to know what had happened to Emily's funds," and from this "the jury could reasonably infer that Emily was also deceived."

While there was extensive documentary and testimonial evidence about what money was moved from which accounts on particular dates and by whom,

there is no testimony demonstrating that Emily was deceived by these actions. The State's evidence of Tami being deceived is, at best, circumstantial. First, Tami was a co-attorney in fact to Rehn under Emily's estate planning documents, not an owner of the property. Second, the State sought an aggravator on each count alleging that the victim was particularly vulnerable, which strongly suggests the victim is Emily, who was an older adult with memory difficulties.[6] And while we give direct and circumstantial evidence the same weight, the evidence does not support a reasonable inference that because the Mooers were deceived, Emily was deceived as well.

A reasonable inference must be based on "logic, common sense, and experience." State v. Jameison, 4 Wn. App. 2d 184, 197, 421 P.3d 463 (2018). It must "follow from an underlying truth," more than just "speculation or conjecture." Id. at 198. If "evidence is equally consistent with two hypotheses, the evidence tends to prove neither." Id. And, particularly in a criminal case, "[w]e will not infer a circumstance when no more than a possibility is shown," or infer "the existence of facts" "from mere possibilit[y]." Id.

Here, Tami testified she only saw Emily a few times a year, Emily was "very close" to Rehn and treated her as a daughter, Emily did not discuss her financial situation with Tami, and Tami "would be unaware of" any agreement Emily had with Rehn. David's testimony was similar, and he admitted he and Tami were not

---

[6] The State's Amended Information does not name a victim, nor do the to-convict instructions or special verdict forms for the aggravators. However, the State confirmed at oral argument that Emily was the victim referenced in these documents and in the presentation of its case to the jury.

involved in or informed of Emily's financial affairs prior to 2014. David also admitted Emily "did things for Taryn that she didn't do" for Tami, such as paying for more expensive private schools. Rehn took the stand at trial, and testified that Emily paid for her to take dance lessons, voice lessons, piano lessons, and beauty pageants. Emily had custom dresses made and booked photography sessions for Rehn's portfolio, and would take her to pageants and stay in hotels. Emily paid for Rehn to attend private elementary school, middle school, and high school. She contributed financially for Rehn's undergraduate degree and graduate degree (including a semester studying in Rome). Emily also paid $5,400 to help Rehn obtain an apartment in Manhattan. Rehn testified Emily helped her pay bills, health insurance, and for travel.

In light of Rehn's testimony as to Emily's consistent financial support over many years, and the testimony of the State's witnesses as to their general lack of knowledge of Emily's financial arrangements, the State failed to demonstrate the essential element of the charged crimes that Emily was deceived. There was no direct evidence, nor any reasonable inference that could be drawn, that Emily was deceived and that deception operated even in part to induce her to part with her property. Even if we were to disregard Rehn's testimony as to her grandmother's history of generosity toward her and any financial arrangements the two may have had, the Mooers' testimony was that they were not involved in Emily's financial decision making and were generally unaware of the state of Emily's finances. Viewing the evidence in the light most favorable to the State, the State failed to prove beyond a reasonable doubt that Emily parted with her money due to

deception by Rehn. Accordingly, this rendered the State unable meet its burden to prove all elements of the charged crimes beyond a reasonable doubt. As such, we reverse Rehn's conviction as to each of the four counts of theft in the first degree by color or aid of deception.[7]

Reversed.

WE CONCUR:

---

[7] Because the sufficiency issue as to the element of deception is dispositive to Rehn's case as a whole, we need not reach the other assignments of error.