# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>ZACHARY THOMAS CUZZETTO,<br><br>Appellant. | No.  59682-2-II<br><br><br><br>UNPUBLISHED OPINION |

LEE, J. — Zachary T. Cuzzetto appeals his convictions for second degree theft (by color or aid of deception), forgery, and first degree identity theft.  Cuzzetto argues (1) there was insufficient evidence to support his theft conviction; (2) the to-convict forgery instructions allowed the jury to convict him of uncharged crimes; and (3) the trial court erred when it did not provide a unanimity instruction for the second element of identity theft.

We hold that, with regard to the second degree theft conviction, there is insufficient evidence to show that Cuzzetto deceived his roommate into making rental payments.  We also hold that, with regard to the forgery conviction, the State did not clearly identify the act upon which it relied for Cuzzetto's forgery conviction, and the error was not harmless.  Finally, we hold that because identity theft is a statutory offense and the State is required to only prove Cuzzetto's intent to commit any crime rather than an intent to commit a specific crime, the trial court did not err when it did not provide a unanimity instruction.  Accordingly, we affirm Cuzzetto's first degree

identity theft conviction.  However, we reverse Cuzzetto's second degree theft and forgery convictions, and we remand to the trial court to dismiss the second degree theft conviction with prejudice and for further proceedings consistent with this opinion.

## FACTS

### A.  BACKGROUND

In September 2023, Cuzzetto contacted Allen Realtors, a property management company, regarding a rental house in Steilacoom.  Cuzzetto was seeking a rental home for himself and three roommates: Adam Friedrich, Seth Johnson, and Jaden Andrews.  However, Cuzzetto presented himself to Allen Realtors as Friedrich.  Cuzzetto, while purporting to be Friedrich, exchanged phone calls and e-mails with Darcie Fish, the property manager for the house.  Cuzzetto introduced himself as Friedrich to another Allen Realtors property manager, Brittany Baird, when she showed him the house.

Cuzzetto submitted a lease application for the house.  Allen Realtors requires lease applicants to submit social security numbers, a copy of their driver's license, rental history, and employment information, including pay stubs for income verification.  The application is submitted through a third-party screening company.  Allen Realtors does not rent to an applicant whose "income isn't sufficient, if they have any evictions on their records, if they have left anyplace [sic] owing damages or rent, [or have] negative rental history."[1]  1 Verbatim Rep. of Proc. (VRP) (Apr. 9, 2024) at 149.

---

[1] Negative rental history includes circumstances when a renter has "left [a rental] where they have complaints at a property or they have balances or they left damages or they have an eviction."  1 Verbatim Rep. of Proc. (VRP) (Apr. 9, 2024) at 149.

The lease application named Friedrich as the primary applicant, and included his full name, date of birth, social security number, and driver's license information. Cuzzetto e-mailed a copy of a driver's license directly to Fish. The driver's license showed a picture of Cuzzetto, but it contained Friedrich's information. Cuzzetto also submitted ADP[2] pay stubs from Microsoft which listed Friedrich as an employee. Johnson was also named in the lease application as an additional occupant. Neither Cuzzetto nor Andrews were listed in the application. The other application documents included acknowledgments, disclosures, and a certification that all the information provided in the application was true and accurate. Cuzzetto signed the application with Friedrich's name.

Allen Realtors, under the impression that Cuzzetto was Friedrich, approved the lease application. Allen Realtors provided a 12-month lease agreement to Cuzzetto, with a move-in date of October 2, 2023, and monthly rent of $3,895. Only Friedrich and Johnson were listed on the lease. Cuzzetto signed the lease agreement as Friedrich. For the first month of tenancy, Allen Realtors required a $1,000 security deposit and $3,643 in prorated rent.

Cuzzetto, Friedrich, Johnson, and Andrews moved into the house. Cuzzetto made the initial rental payment and security deposit online. However, Fish received a "'nonsufficient funds'" notification for the payment. 1 VRP (Apr. 9, 2024) at 175. Fish attempted to contact Cuzzetto through phone calls and e-mail, but Cuzzetto did not respond. Fish was confused and concerned because Cuzzetto had been very responsive up until that point. Fish asked Baird to go to the house to contact Cuzzetto, whom they both knew as Friedrich, regarding payment.

---

[2] ADP is a commonly used payroll service company.

Baird went to the house, and Andrews opened the door. When Baird asked for Friedrich, Andrews told her that Friedrich was not home. Baird stated that she needed to speak with someone regarding rental payments. Andrews replied that Cuzzetto handled payments and that Cuzzetto also was not home but would return shortly. Baird did not know who Cuzzetto was.

While Baird was waiting for Cuzzetto, she called the police because she did not know who was in the house. When Cuzzetto returned to the house, he spoke with Baird as if he was Friedrich. When Baird mentioned the rental payments, Cuzzetto began to cry and told her he would "come up with the money." 1 VRP (Apr. 10, 2024) at 64.

Cuzzetto then spoke with Fish on the phone and told her the individuals in the house were friends and did not live there. He also told her that he would bring a money order to the Allen Realtors office within the hour. Although Fish waited for Cuzzetto for several hours at the office, Cuzzetto never arrived. After Fish left the office, Cuzzetto slipped a money order, for only $1,200, underneath the door.

After dropping off the money order, Cuzzetto attempted to make three additional payments online on October 6. Only $1,300 went through as a completed payment.

During Fish's conversation with Cuzzetto, she had requested additional verification of employment. Because Cuzzetto, while posing as Friedrich, represented that he worked at Microsoft, Fish asked Cuzzetto to e-mail her from his Microsoft e-mail account. On October 10, Cuzzetto e-mailed Fish from the e-mail address "adam.friedrich@microsoftdiversityrecruitment.com." Ex. 12. The e-mail was part of a larger e-mail chain that purportedly included Friedrich's supervisor at Microsoft, Jennifer Wilson. Wilson replied to the e-mail chain, verifying that Friedrich was a Microsoft employee.

4

In the meantime, Fish was concerned about the individuals Cuzzetto had told her were "friends." 1 VRP (Apr. 9, 2024) at 197. She researched the names "Zachary Cuzzetto" and "[Jaden] Andrews," which were provided to her by Baird after Baird's visit to the house. 1 VRP (Apr. 9, 2024) at 189. In a public records search, Fish learned that Cuzzetto and Andrews were both involved in an eviction action. Fish researched the phone number Cuzzetto had provided her and learned that the number belonged to Cuzzetto rather than Friedrich. Fish also saw on social media an account for Zachary Cuzzetto, which showed a photo of Cuzzetto, whom she recognized as Friedrich. Finally, after entering "Zachary Cuzzetto" into a Google search, Fish found video footage from a year earlier of a local news station and police interviewing the manager of a motel, who happened to be Cuzzetto, regarding crime in the area. 1 VRP (Apr. 9, 2024) at 189. After viewing the old news footage, Fish no longer believed Cuzzetto was employed by Microsoft.

Fish contacted the Steilacoom police about possible fraud and identity theft and passed along the information she had obtained.[3] In early November 2023, Officer Justin Hamrick followed up on Fish's call. Prior to contacting Cuzzetto, Officer Hamrick checked with the Department of Licensing system the driver's license copy provided with the rental application. He obtained a match for Friedrich based on the license information, but Friedrich's photo was associated with the license, not Cuzzetto's as shown on the driver's license copy. Officer Hamrick then went to the house and spoke with Cuzzetto. Officer Hamrick asked if Cuzzetto was willing

---

[3] Fish also initiated eviction proceedings. Fish identified the individuals she "knew to be [at the house]" in the eviction action, which "included Zachary Cuzzetto." 1 VRP (Apr. 9, 2024) at 192. Based on the lease agreement, she also named Friedrich in the action, even though she was not certain if Friedrich was truly one of the renters. Allen Realtors regained possession of the house in mid-December 2023.

to go to the police station for an interview regarding the false information on the lease application. Cuzzetto declined, and Officer Hamrick placed him under arrest.

While in police custody, Cuzzetto acknowledged that he was familiar with the fake driver's license. Officer Hamrick asked Cuzzetto how the license had been created, and Cuzzetto replied, "[C]omputers," but did not elaborate. 1 VRP (Apr. 10, 2024) at 50.

B.     TRIAL

The State charged Cuzzetto with first degree identity theft (Count I), forgery of "a lease application and agreement" (Count II), and second degree theft (Count III). Clerk's Papers (CP) at 6. For the first degree identity theft charge in Count I, the State also alleged a "major economic offense" aggravator. CP at 6.

The matter proceeded to a jury trial. Several witnesses testified to the facts described above. Neither Johnson nor Andrews testified. Cuzzetto also did not testify.

1.     Friedrich's Testimony

Adam Friedrich testified that he never worked at Microsoft; he worked at a Wendy's. Friedrich confirmed that the lease application contained his information, including his social security number, but he stated that he did not fill it out. Friedrich also stated that he did not sign any of the lease application documents nor did he give permission to anyone to sign those documents on his behalf. Friedrich confirmed that the driver's license copy contained his information, but it was not his photograph on the copy. He did not give anyone permission to alter his driver's license. Friedrich was unaware that Cuzzetto had used his information for the documents at all.

Friedrich stated that he lived in the house in October and November 2023. Cuzzetto coordinated rent and utility payments between the roommates. Friedrich was aware his name was on the lease, and he paid rent on the house. Friedrich paid three months' worth of rent, at $900 per month, to Cuzzetto. Friedrich stated: "We just kind of gave [Cuzzetto] a flat rate, and then like he paid for everything with the money that we gave him." 1 VRP (Apr. 10, 2024) at 40. The utilities were always on while they lived at the house, and he understood that someone was paying the utility bills. Occasionally, Friedrich gave Cuzzetto extra funds beyond his portion of the rent to help cover rental payments for Johnson and Andrews, who he knew did not always pay their share. Friedrich also understood that Cuzzetto often made up the deficit for Johnson and Andrews.

Friedrich viewed Cuzzetto as a good friend. He did not believe Cuzzetto stole from him. During his testimony, Friedrich stated: "If I didn't have to be, I wouldn't be here testifying against [Cuzzetto], and I don't believe that he did anything that he did with malicious intent." 1 VRP (Apr. 10, 2024) at 33.

2. Jury Instructions

The trial court provided to the jury the following to-convict instruction for first degree identity theft (Instruction No. 7):

> To convict the defendant of the crime of identity theft in the first degree, as charged in Count 1, each of the following elements of the crime must be proved beyond a reasonable doubt:
> (1) That between on or about September 27, 2023 and on or about November 9, 2023, the defendant knowingly obtained, possessed, or transferred or used a means of identification or financial information of Adam Friedrich;
> (2) That the defendant did so with the intent to commit any crime;
> (3) That the defendant knew that the means of identification or financial information belonged to another person;

> > (4) That the defendant obtained credit, money, goods, services, or anything else in excess of $1,500 in value from the acts described in Element 1; and
> > (5) That any of these acts occurred in the State of Washington.
> > If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.
> > On the other hand, if, after weighing all of the evidence you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

CP at 37.

> The to-convict instruction for forgery (Instruction No. 21) stated:

> > To convict the defendant of the crime of forgery, as charged in Count 2, each of the following elements of the crime must be proved beyond a reasonable doubt:
> > (1) That between on or about September 27, 2023, and on or about November 9, 2023, the defendant falsely made or completed or altered a written instrument;
> > (2) That the defendant acted with intent to injure or defraud; and
> > (3) That this act occurred in the State of Washington.
> > If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.
> > On the other hand, if, after weighing all of the evidence you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

CP at 51. "Written instrument" (Instruction No. 22) was defined for the jury as: "[A]ny paper, document or other instrument containing written or printed matter or its equivalent or trademark, or other evidence or symbol of value, right, privilege, or identification." CP at 52.

As to second degree theft (Instruction No. 27), the trial court instructed the jury that the crime requires a person committing "theft of property or services exceeding $750 in value." CP at 57. "Theft" (Instruction No. 28) was defined for the jury as:

> For purposes of Count 3, theft means by color or aid of deception, to obtain control over the property or services of another, or the value thereof, with intent to deprive that person of such property or services.

CP at 58. The to-convict instruction for second degree theft (Instruction No. 29) stated:

> To convict the defendant of the crime of theft in the second degree, as charged in Count 3, each of the following elements of the crime must be proved beyond a reasonable doubt:
>
> (1) That between on or about September 27, 2023, and on or about November 9, 2023, the defendant by color or aid of deception, obtained control over property or services of another or the value thereof;
>
> (2) That the property or services obtained by a common scheme or plan exceeded $750 in value;
>
> (3) That the defendant intended to deprive the other person of the property or services; and
>
> (4) That this act or any act occurred in the State of Washington.
>
> If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.
>
> On the other hand, if, after weighing all of the evidence you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

CP at 59. Neither the State nor Cuzzetto objected to any of the jury instructions.

    3.        Closing Arguments

During closing arguments, the State walked through the to-convict jury instructions for each of the charges. The State argued:

> This case is about identity theft. . . .
>
> . . . .
>
> And it starts with an online rental application. . . . It's a lease application. . . .
>
> . . . .
>
> . . .There's an ADP pay stub from Microsoft to [Friedrich], but we also know [Friedrich] didn't work at Microsoft. . . . [Y]ou have e-mails purporting to be from Microsoft to [Friedrich]. . . .
>
> You also have the driver's license. . . .

. . . .

And then we think about the crime. Now, . . . we'll look at Instruction 7. The second element says that the defendant did so with the intent to commit any crime. So that's any crime, but I want to suggest two specific crimes to you. And there are two crimes that you have definitions for already because they're the same types of crimes in Counts II and III, okay? And that's theft and forgery.

So I want to start with forgery, and we can look at the definition of forgery from Count II. So there we have—Instructions 20 and 21 are your definitions of forgery, but then we go into some of the definitions that come after that. So we can look at the definition of written instrument for 22—which is that Instruction No. 22.

And why did Mr. Cuzzetto do all of this? He did this for Exhibit 14 that I have here, and that's this lease agreement. He wanted this lease agreement. This lease agreement, if we look at the signature page . . . there's several signature pages on here. . . . Adam Friedrich and Seth Johnson. You don't see [Cuzzetto's] name on anything. Now, why is that? Well, you heard testimony from Ms. Fish about the ramifications of this document. And it's the ramifications for many of these documents, but for this document in particular, who is she going to send to collections for nonpayment? The names on this document. Not Mr. Cuzzetto because his name is not on the document, right?

Who is [Fish] going to start eviction proceedings against? The names that are on this document. And you heard from [Friedrich] he didn't approve signing this document. That's forgery and that's Count II, but that's also the crime [Cuzzetto] intended to commit [for Count I], one of the crimes he committed, he intended to commit, when [Cuzzetto] stole [Friedrich's] identity.

So all of those steps [Cuzzetto] did was to sign [Exhibit 14, the lease,] and to sign the other exhibits. I'm not going to put them all up. You're going to get a chance to look at all of them, but we've talked about some of these authorizations. There's a whole bundle of legal rights that are in that application document, all of which have [Friedrich's] name on it, all of which have a signature that's supposed to be [Friedrich's], all of which [Friedrich] said were not his signature and that he did not give anyone permission to put his name on it.

So those documents are written instruments. They are written instruments that were forged, and that's one of the reasons why Mr. Cuzzetto used [Friedrich's] information.

10

2 VRP (Apr. 11, 2024) at 80-86.

The State then proceeded to discuss the intent element within identity theft as follows:

> We also think about intent in terms of all of these steps that he took, right? And as I said at the beginning, it's not just one thing to say okay, well, here's [Friedrich's] information. Every single time he was confronted, [Cuzzetto] doubled down. He provided more false information. He provided the falsified pay stubs. He provided the falsified e-mails. He provided the falsified driver's license. . . .
>
> Now, we've talked about the forgeries. There's a couple of things, right? The signatures on those documents are forgeries. We've already talked about that, the lease agreement. When we talk about what has that legal obligation, we're talking about the lease agreement, okay?

2 VRP (Apr. 11, 2024) at 89-90.

With regard to the second degree theft (by color or aid of deception) charge (Count III),

the State shifted its focus. 2 VRP (Apr. 11, 2024) at 90.

> And in Count III, we're not talking about anything having to do with the property really. We're going back to [Friedrich's] testimony, and we're going back to Exhibit 15, which is that ledger. . . . And we're talking about [Friedrich's] testimony about paying the money to Mr. Cuzzetto for rent. And it's important when we look at these instructions and we look at . . . that definition of deception that we see that applies in Instructions 30 and 31, that's what [Friedrich] thought he was paying money for, not all this other stuff, right? But lease money, lease money that was never paid, and you can see that through the ledgers.
>
> We also heard in terms of value how much his contribution for the rent was every month. We heard about the four people living there. We can go through these records, and we can see that [Friedrich] gave Mr. Cuzzetto money for rent that somehow never made it to Allen Realtors. That's Count III, the . . . theft in the second degree.

2 VRP (Apr. 11, 2024) at 90-91.

### 4. Verdict and Sentencing

The jury found Cuzzetto guilty on all charges. The trial court polled the jury, and all

members of the jury confirmed that the verdict was the verdict of the jury and that it was their own

verdict. Cuzzetto was sentenced to 90 days of confinement for each conviction, with each confinement term to run concurrently with the others, and 12 months of community custody.

Cuzzetto appeals his convictions.

## ANALYSIS

Cuzzetto argues that (1) the State presented insufficient evidence of second degree theft; (2) the to-convict instructions for forgery allowed the jury to convict him of uncharged crimes; and (3) he was "denied his constitutional right to jury unanimity" on the first degree identity theft charge. Br. of Appellant at 3. We address each argument in turn below.

A. SECOND DEGREE THEFT

Cuzzetto argues that the State presented insufficient evidence that he obtained Friedrich's rental payments "'by color or aid of deception.'" Br. of Appellant at 20. Specifically, Cuzzetto asserts that he did not deceive Friedrich into contributing rent money or making him legally responsible for the lease because Friedrich knew his name was on the lease. The State argues that the evidence demonstrates Cuzzetto deceived Friedrich into giving him rent money "based on the false assumption that Cuzzetto legitimately obtained the lease agreement." Br. of Resp't at 11. We agree with Cuzzetto.

1. Legal Principles

a. Sufficiency of the evidence

The State must prove every element of a crime beyond a reasonable doubt. *State v. Johnson*, 188 Wn.2d 742, 750, 399 P.3d 507 (2017). "Evidence is sufficient to support a guilty verdict if any rational trier of fact, viewing the evidence in the light most favorable to the State,

could find the elements of the charged crime beyond a reasonable doubt." *State v. Cardenas-Flores*, 189 Wn.2d 243, 265, 401 P.3d 19 (2017).

Claims of insufficiency admit the truth of the State's evidence. *State v. Zghair*, 4 Wn.3d 610, 620, 567 P.3d 1 (2025). We view the evidence, and all reasonable inferences drawn therefrom, in a light most favorable to the State. *Cardenas-Flores*, 189 Wn.2d at 265-66. "Circumstantial and direct evidence are to be considered equally reliable." *Id.* at 266.

However, "[w]hen evidence is equally consistent with two hypotheses, the evidence tends to prove neither." *State v. Jameison*, 4 Wn. App. 2d 184, 198, 421 P.3d 463 (2018). Courts may not infer facts from mere possibilities. *Id.*

b.      Theft by color or aid of deception

A person is guilty of theft in the second degree "if he or she commits theft of: (a) Property or services which exceed(s) seven hundred fifty dollars in value but does not exceed five thousand dollars in value." RCW 9A.56.040(1)(a).

RCW 9A.56.020 defines theft to include circumstances when an individual "[b]y color or aid of deception . . . obtain[s] control over the property or services of another or the value thereof, with intent to deprive him or her of such property or services." RCW 9A.56.020(1)(b).[4] "'By color or aid of deception' means that the deception operated to bring about the obtaining of the property or services; it is not necessary that deception be the sole means of obtaining the property or services." RCW 9A.56.010(4).

---

[4] The information and judgment and sentence both list RCW 9A.56.020(1)(a) as the statute Cuzzetto violated. RCW 9A.56.020(1)(a) provides another definition of theft. However, it is evident from the record, the language of the charging document, and the parties' briefing that Cuzzetto was charged with violating RCW 9A.56.020(1)(b).

Deception includes a broad range of conduct and may occur when a person "[c]reates or confirms another's false impression which the actor knows to be false"; "[f]ails to correct another's impression which the actor previously has created or confirmed"; or "[p]revents another from acquiring information material to the disposition of the property involved." RCW 9A.56.010(5)(a)-(c); *State v. Mehrabian*, 175 Wn. App. 678, 700, 308 P.3d 660, *review denied*, 178 Wn.2d 1022 (2013), *abrogated on other grounds by State v. Schwartz*, 194 Wn.2d 432, 440-41, 450 P.3d 141 (2019). Further, deception includes "'not only representations about past or existing facts, but also representations about future facts, inducement achieved by means other than conduct or words, and inducement achieved by creating a false impression even though particular statements or acts might not be false.'" *Mehrabian*, 175 Wn. App. at 700 (quoting *State v. Casey*, 81 Wn. App. 524, 528, 915 P.2d 587, *review denied*, 130 Wn.2d 1009 (1996)). Express misrepresentation is not required; instead, "'[t]he statute focuses on the false impression created rather than the falsity of any particular statement.'" *Id.* (quoting *State v. Wellington*, 34 Wn. App. 607, 610, 663 P.2d 496, *review denied*, 100 Wn.2d 1006 (1983)).

The State must prove that the victim of the theft relied upon the deception, or in other words, the deception operated as inducement. *State v. Briejer*, 172 Wn. App. 209, 218, 289 P.3d 698 (2012). The deception need not be the only reason the victim parted with their property. *Mehrabian*, 175 Wn. App. at 701. However, "[i]f the victim would have parted with the property even if the true facts were known, there is no theft." *Id.*

2.      Insufficient Evidence of Deception

Cuzzetto argues that he did not deceive Friedrich into making rental payments for a house they actually lived in and that Friedrich knew his name was on the lease. Cuzzetto also argues that

14

even if he wrongfully obtained funds from Friedrich, the amount he obtained is insufficient to sustain a second degree theft conviction. The State argues that Cuzzetto committed second degree theft when Cuzzetto deceived Friedrich by representing that he had legitimately procured a lease, asking Friedrich for rent payments, pocketing the money Friedrich gave him instead of paying the rent, and then making Friedrich legally responsible on the lease agreement.

Here, the record shows that, unbeknownst to Friedrich, Cuzzetto completed the lease application and signed the lease agreement as Friedrich. In this sense, Cuzzetto engaged in a deception with Friedrich insofar as he created the impression that he legitimately procured a lease. *See* RCW 9A.56.010(5)(a).

The record also shows that even though the lease was fraudulently obtained, it was a genuine lease for the property with the property management company. The lease contained correct information to the extent that it listed Friedrich and Johnson as the tenants, both of whom actually resided at the house. Friedrich testified that he lived in the house in October and November 2023, he knew his name was on the lease, and he made rental payments consistent with that understanding. Friedrich also testified that the utilities functioned during that time and that he understood part of his rental payment contributed to payment of utilities. Thus, there is explicit evidence that Friedrich paid rent because his name was on the lease, he lived at the house, and the utilities functioned, not because Cuzzetto induced him to pay for something other than the lease or utilities.[5] *State v. George*, 161 Wn.2d 203, 209-10, 164 P.3d 506 (2007) (stating that generally in cases of theft by deception, something falsely described is given in exchange to induce the

---

[5] It is notable that during trial, Friedrich unequivocally stated that Cuzzetto had not stolen from him.

transaction). Further, because Friedrich knew his name was on the lease, a reasonable inference arises that Friedrich knew he could be held legally responsible for any shortfalls in rental payments or be subject to an eviction action in the event of the roommates' failure to pay total rent.

Even if Cuzzetto induced Friedrich to pay for something falsely described, there is insufficient evidence to determine beyond a reasonable doubt that Cuzzetto wrongfully obtained more than $750 from Friedrich. The record shows that Cuzzetto made three payments to Allen Realtors, for a total of $2,500. Friedrich testified that he paid approximately three months' worth of rent total, or $2,700, to Cuzzetto. The parties note—and indeed, the State concedes—that the amount of rent that Friedrich paid Cuzzetto within the charging period[6] may have been less than $2,700 and was more likely only $900 or $1,800.

There is no evidence in the record of whether Cuzzetto, Johnson, or Andrews paid any part of their rent, be it in full, in part, or not at all. Friedrich did, however, testify that Johnson and Andrews often fell short on their rental payments. Based on Friedrich's testimony and because Cuzzetto paid less than was due to Allen Realtors, a reasonable inference arises that Johnson and Andrews did not actually pay their full portions of rent. There is no evidence in the record of how much the utilities cost, when those payments were due, or if those payments were actually made. There also is no evidence in the record of what happened to Friedrich's rental payments once he transferred them to Cuzzetto, nor was there an attempt to trace the funds Friedrich paid to Cuzzetto.

Cuzzetto argues that even assuming Friedrich paid $1,800 worth of rent, those funds were accounted for within the payments Cuzzetto made to Allen Realtors because $2,500 is more than

---

[6] The charging period was for conduct between September 27, 2023, and November 9, 2023.

$1,800.  Cuzzetto further asserts that even if Friedrich paid the full $2,700 within the charging period, it would still be insufficient to sustain a second degree theft conviction because Cuzzetto would have allegedly pocketed only $200.  The State argues that any amount Cuzzetto pocketed is immaterial; rather, the salient point is that Cuzzetto obtained more than $750 from Friedrich generally "based on the false impression that [Friedrich] was paying for a legitimate rental home."  Br. of Resp't at 19.

First, both Cuzzetto's and the State's arguments assume facts not in the record.  Cuzzetto's argument assumes that of the four roommates, only Friedrich made rental payments, and those rental payments were entirely used to pay Allen Realtors.  Thus, according to Cuzzetto, Friedrich was not deceived about where his money ended up.  The State's argument assumes the opposite— that the four roommates had sufficient rental funds between them and that Cuzzetto pocketed some of those funds rather than pay the rent in full.  Cuzzetto's argument is certainly a possibility.  But the State's argument is equally a possibility.  There is simply no evidence in the record to show that one possibility is more likely than the other.  "When evidence is equally consistent with two hypotheses, the evidence tends to prove neither," and courts may not infer facts from mere possibilities.  *Jameison*, 4 Wn. App. 2d at 198.

Further, the State assumes Friedrich would have refused to make rental payments had he known the truth behind "the false impression [of] . . . a legitimate rental home."  Br. of Resp't at

17

19.   The State likens the circumstances here to the facts in *State v. Williams*.[7]  *Williams* is an unpublished case and not binding on this court.[8]

Because the record shows that Friedrich knew his name was on the lease, Friedrich lived in the house and used the utilities, and Cuzzetto paid Allen Realtors $2,500, there is insufficient evidence to show beyond a reasonable doubt that Cuzzetto induced Friedrich to pay him rent through deception.  Accordingly, we reverse Cuzzetto's conviction for second degree theft and remand for the trial court to dismiss the second degree theft charge with prejudice.  *See State v. Fuller*, 185 Wn.2d 30, 36, 367 P.3d 1057 (2016).

B.   FORGERY

Cuzzetto argues that the to-convict jury instructions for his forgery charge allowed the jury to convict him of uncharged instances of forgery.  Specifically, Cuzzetto contends that the jury

---

[7]  No. 34171-2-III (Wash. Ct. App. Apr. 3, 2018) (unpublished), https://www.courts.wa.gov/opinions/pdf/341712_unp.pdf, *review denied*, 191 Wn.2d 1023 (2018).

[8]  Even if we were to consider *Williams*, this case is distinguishable from *Williams*.  In *Williams*, Williams identified unoccupied houses, re-keyed them, and then represented himself as the owner of those houses to prospective tenants and rented them out.  No. 34171-2-III, slip op. at 1-2.  Williams, rather than the true homeowners, collected the rent.  *Id.*

Unlike the tenants in *Williams*, Cuzzetto, Friedrich, Johnson, and Andrews lived in a legitimate rental home.  Cuzzetto, albeit fraudulently, engaged with Allen Realtors, the true property manager.  And Allen Realtors provided Cuzzetto with a genuine lease.  As discussed above, the lease contained correct information to the extent that it listed Friedrich and Johnson as tenants.  Allen Realtors received some payments for the rental home.  In light of Friedrich's testimony that he paid rent *because* he lived at the house, knew his name was on the lease, and used the utilities, even when the evidence is viewed in a light most favorable to the State, a rational trier of fact could not say beyond a reasonable doubt that Friedrich would have refused to pay rent had he known all the facts.  *Mehrabian*, 175 Wn. App. at 701 ("If the victim would have parted with the property even if the true facts were known, there is no theft."); *Cardenas-Flores*, 189 Wn.2d at 265-66.

18

instructions failed to limit a conviction based only on the lease application and agreement, as stated in the information. The State argues that during closing arguments, the prosecutor "clearly elected" which documents the State based its forgery charge on. Br. of Resp't at 27. We agree with Cuzzetto.

### 1. Legal Principles

A person is guilty of forgery if, with intent to injure or defraud, "[h]e or she falsely makes, completes, or alters a written instrument." RCW 9A.60.020(1)(a). A "written instrument" includes "[a]ny paper, document, or other instrument containing written or printed matter or its equivalent; or . . . any access device, token, stamp, seal, badge, trademark, or other evidence or symbol of value, right, privilege, or identification." RCW 9A.60.010(9); *see generally* RCW 9A.60.010.

The State is constitutionally required to inform a criminal defendant of the nature of the charges he or she will face at trial, and it cannot try a defendant for uncharged crimes. *State v. Sanchez*, 14 Wn. App. 2d 261, 267, 471 P.3d 910 (2020); *see also* U.S. CONST. amend. VI; *State v. Johnson*, 29 Wn. App. 2d 401, 414, 540 P.3d 831 (stating a defendant "may be convicted of only charges contained in the information"), *review denied*, 2 Wn.3d 1035, *cert. denied*, 145 S. Ct. 771, (2024). Accordingly, a jury instruction is erroneous if it is "more far-reaching than the charge in the information." *State v. Brown*, 45 Wn. App. 571, 576, 726 P.2d 60 (1986).

"An erroneous instruction given on behalf of the party in whose favor the verdict was returned is presumed prejudicial unless it affirmatively appears that the error was harmless." *State v. Jain*, 151 Wn. App. 117, 121, 210 P.3d 1061 (2009). Such an error "may be harmless if other instructions potentially cured the error by limiting the crime to the charged alternative." *State v.*

*Friday*, 33 Wn. App. 2d 719, 732, 565 P.3d 139, *review denied*, 574 P.3d 539 (2025).  Also, the State may tell the jury what act the jury must rely upon in deliberations, known as an election, or the trial court "may instruct the jury that it must unanimously rely on a specific criminal act to support its conviction," known as a *Petrich*[9] instruction.  *State v. Aguilar*, 27 Wn. App. 2d 905, 924, 534 P.3d 360 (2023).  "To avoid constitutional error, any election must 'clearly identif[y]' the act on which the charge in question is based."  *Id.* (alteration in original) (internal quotation marks omitted) (quoting *State v. Carson*, 184 Wn.2d 207, 227, 357 P.3d 1064 (2015)).

If there is neither an election nor a *Petrich* instruction, then there is constitutional error.  *Id.* at 928.  Courts employ a harmless error analysis to determine if reversal is warranted.  *Id.*  Under the constitutional harmless error standard, "[a]n error is harmless 'only if *no* [rational trier of fact] could have a reasonable doubt as to any of the incidents alleged.'"  *Id.* (second alteration in original) (emphasis in original) (quoting *State v. Kitchen*, 110 Wn.2d 403, 411, 756 P.2d 105 (1988)).

2.    State Failed to Elect the Lease Application and Agreement

Here, the State charged Cuzzetto with forging "a lease application and agreement."  CP at 6.  However, the to-convict jury instruction for forgery did not limit the conviction based only on the lease application and agreement.  Instead, the instruction stated that the State must prove that "on or about September 27, 2023, and on or about November 9, 2023, [Cuzzetto] falsely made or completed or altered *a written instrument*."  CP at 51 (emphasis added).

---

[9]  *See generally State v. Petrich*, 101 Wn.2d 566, 683 P.2d 173 (1984).

20

The record shows that in addition to the lease application and agreement, the State introduced evidence of several other alleged forged documents (e.g., an altered driver's license, fake Microsoft pay stubs, and an e-mail chain purporting to include a Microsoft supervisor, among other documents). Therefore, the driver's license, pay stub, or e-mail chain, alone or together, could also form the basis for the State's forgery charge against Cuzzetto. Because the instruction did not specify *which* written instrument formed the basis of the State's charge, the instruction was erroneous. *Brown*, 45 Wn. App. at 576.

The record also shows that in closing arguments, the State may have attempted to elect the lease application and agreement as the basis for the forgery charge, but the State failed to clearly do so. After talking about the falsified online lease application, ADP pay stub, e-mails, and driver's license, the State argued:

> [W]e can look at the definition of forgery from Count II. So there we have—Instructions 20 and 21 are your definitions of forgery, but then we go into some of the definitions that come after that. So we can look at the definition of written instrument for 22—which is that Instruction No. 22.
>
> And why did Mr. Cuzzetto do all of this? He did this for Exhibit 14 that I have here, and that's this lease agreement. He wanted this lease agreement. This lease agreement, if we look at the signature page . . . there's several signature pages here. . . . Adam Friedrich and Seth Johnson. You don't see [Cuzzetto's] name on anything. Now, why is that? Well, you heard testimony from Ms. Fish about the ramifications of this document. And it's the ramifications for many of these documents, but for this document in particular, who is she going to send to collections for nonpayment? The names on this document. Not Mr. Cuzzetto because his name is not on the document, right?
>
> Who is [Fish] going to start eviction proceedings against? The names that are on this document. And you heard from [Friedrich] he didn't approve signing this document. That's forgery and that's Count II, but that's also the crime [Cuzzetto] intended to commit, one of the crimes he committed, he intended to commit, when [Cuzzetto] stole [Friedrich's] identity.

So all of those steps [Cuzzetto] did was to sign [Exhibit 14, the lease] *and to sign the other exhibits*. I'm not going to put them all up. You're going to get a chance to look at all of them, but we've talked about some of these authorizations. There's a whole bundle of legal rights that are in that application document, all of which have [Friedrich's] name on it, all of which have a signature that's supposed to be [Friedrich's], all of which [Friedrich] said were not his signature and that he did not give anyone permission to put his name on it.

*So those documents are written instruments. They are written instruments that were forged*, and that's one of the reasons why Mr. Cuzzetto used [Friedrich's] information.

2 VRP (Apr. 11, 2024) at 85-86 (emphasis added).

Then, while discussing the intent element of Cuzzetto's identity theft charge, the State argued:

We also think about intent in terms of all of these steps that he took, right? And as I said at the beginning, it's not just one thing to say okay, well, here's [Friedrich's] information. Every single time he was confronted, [Cuzzetto] doubled down. He provided more false information. *He provided the falsified pay stubs. He provided the falsified e-mails. He provided the falsified driver's license.* . . .

Now, we've talked about the forgeries. There's a couple of things, right? The signatures on *those documents* are *forgeries*. We've already talked about that, the lease agreement. When we talk about what has that legal obligation, we're talking about the lease agreement, okay?

2 VRP (Apr. 11, 2024) at 89-90 (emphasis added).

In response to the State's arguments, Cuzzetto argues in his reply brief that the State's closing argument did not constitute a "clear election." Reply Br. of Appellant at 18. Cuzzetto asserts that viewing the State's language after its alleged "election," it is not clear that the State intended to rely only on the lease application and agreement. Reply Br. of Appellant at 20.

Here the record shows that the State referenced the other falsified documents besides the lease application and agreement in its closing argument. While the State's reference to those other

falsified documents is couched in the State's discussion of identity theft, the State still emphasized those other documents: "the falsified pay stubs . . . the falsified e-mails . . . the falsified driver's license . . . those documents are forgeries." 2 VRP (Apr. 11, 2024) at 89-90. And while the State did argue that the forged lease application and agreement had legal obligations attached to it, the State also argued that the other falsified documents had legal obligations attached to them and never disclaimed the other falsified documents as a basis for the forgery charge. Nor did the State inform the jury that the jury *could not* rely on one of those other falsified documents for the forgery charge. *See Carson*, 184 Wn.2d at 227-28. Indeed, the State even emphasized the level of sophistication and skill Cuzzetto needed to have to create such a convincing false driver's license. Thus, in context, it cannot be said that the State clearly identified the act on which Cuzzetto's forgery charge is based. *Aguilar*, 27 Wn. App. 2d at 924. Because the State did not clearly identify the act, and because the trial court did not provide a *Petrich* instruction, there is constitutional error.

We must next assess whether the error was harmless. *Id.* at 928. Based on the foregoing facts, a rational juror could have reasonable doubt as to which written document served as the basis of Cuzzetto's forgery charge. *Id.* at 930. Accordingly, we hold the error was not harmless and reverse Cuzzetto's forgery conviction.

C.   IDENTITY THEFT

Cuzzetto argues that the trial court was required to give a unanimity instruction as to the second element of identity theft (i.e., for which crime Cuzzetto allegedly intended to commit when he appropriated Friedrich's identity). Cuzzetto contends that the State needed to prove specific intent and that the jury needed to agree upon the intended criminal act. We disagree.

1.      Legal Principles

Generally, a party may not raise an error for the first time on appeal.  RAP 2.5(a); *State v. Strine*, 176 Wn.2d 742, 749, 293 P.3d 1177 (2013).  However, appellate courts may "review instructional errors raised for the first time on appeal for manifest constitutional error."  *State v. Dillon*, 12 Wn. App. 2d 133, 139, 456 P.3d 1199, *review denied*, 195 Wn.2d 1022 (2020); RAP 2.5(a)(3).

"To satisfy due process, to-convict jury instructions must instruct the jury on every essential element of the crime."  *State v. Bergstrom*, 199 Wn.2d 23, 38, 502 P.3d 837 (2022).  In cases where multiple acts could form the basis of a defendant's charge, the jury must be unanimous as to which incident constituted the charged crime.  *State v. Bobenhouse*, 166 Wn.2d 881, 893, 214 P.3d 907 (2009).  As stated above, the State must either elect which act it relies upon or the trial court must give the jury a unanimity instruction.  *Id.*  "[W]hen the State fails to make proper identification of the specific act charged and the trial court fails to instruct the jury on unanimity, there is constitutional error."  *State v. Vander Houwen*, 163 Wn.2d 25, 38, 177 P.3d 93 (2008); *accord Aguilar*, 27 Wn. App. 2d at 917 ("Our state constitution protects a criminal defendant's right to be convicted only by a unanimous jury.").

RCW 9.35.020(1) sets forth the crime of identity theft and provides: "No person may knowingly obtain, possess, use, or transfer a means of identification or financial information of another person, living or dead, with the intent to commit, or to aid or abet, any crime."

Identity theft is a statutory offense.  *State v. Fedorov*, 181 Wn. App. 187, 197, 324 P.3d 784, *review denied*, 181 Wn.2d 1009 (2014).  Based on the language of the statute, the intent to commit a *specific* crime is not an element of RCW 9.35.020.  *Id.* at 197-98; *see State v. Bergeron*,

24

105 Wn.2d 1, 4, 711 P.2d 1000 (1985). Rather, RCW 9.35.020 "merely requires proof of intent to commit 'any crime.'" *Fedorov*, 181 Wn. App. at 197 (quoting RCW 9.35.020(1)). Indeed, the Washington Supreme Court has held that, in cases of statutory offenses, "the specific crime or crimes intended to be committed . . . is *not* an element . . . that must be included in the information, jury instructions or in the trial court's findings and conclusions. It is sufficient if the jury is instructed . . . in the language of the . . . statutes." *Bergeron*, 105 Wn.2d at 16 (emphasis in original).

"When intent is an element of the crime, 'intent to commit a crime may be inferred if the defendant's conduct and surrounding facts and circumstances plainly indicate such an intent as a matter of logical probability.'" *State v. Vasquez*, 178 Wn.2d 1, 8, 309 P.3d 318 (2013) (quoting *State v. Woods*, 63 Wn. App. 588, 591, 821 P.2d 1235 (1991)).

2.      No Unanimity Instruction Required

Here, the to-convict instructions for identity theft stated:

> To convict the defendant of the crime of identity theft in the first degree, as charged in Count 1, each of the following elements of the crime must be proved beyond a reasonable doubt:
>     (1)    That between on or about September 27, 2023 and on or about November 9, 2023, the defendant knowingly obtained, possessed, or transferred or used a means of identification or financial information of Adam Friedrich;
>     (2)    That the defendant did so with the intent to commit any crime;
>     (3)    That the defendant knew that the means of identification or financial information belonged to another person;
>     (4)    That the defendant obtained credit, money, goods, services, or anything else in excess of $1,500 in value from the acts described in Element 1; and
>     (5)    That any of these acts occurred in the State of Washington.
>     If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.

On the other hand, if, after weighing all of the evidence you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

CP at 37. The record shows that the jury instructions properly state the law. *See* RCW 9.35.020(1). The record also shows that Cuzzetto did not object to the jury instructions. Thus, he raises this error for the first time on appeal. Because Cuzzetto alleges an instructional error, we may review the alleged error for manifest constitutional error. *Dillon*, 12 Wn. App. 2d at 139; RAP 2.5(a)(3).

In closing arguments, the State presented two possible crimes that Cuzzetto intended to commit: forgery, as charged in Count II, or theft against Allen Realtors. Cuzzetto argues that the jury needed to be unanimous as to which crime he intended to commit, and it was error for the jury to consider both forgery and theft. Cuzzetto further asserts that the State "did not offer overwhelming evidence to support either alleged commission of the elements of identity theft." Br. of Appellant at 49.

Cuzzetto's arguments are unpersuasive. First, *Fedorov* explicitly states, based on the plain language of the statute, that RCW 9.35.020 requires only "proof of intent to commit '*any crime*.'" 181 Wn. App. at 197 (emphasis added) (quoting RCW 9.35.020(1)). RCW 9.35.020 "does not support 'reading the element of intent to commit a particular crime into the statutory offense.'" *Id.* at 198 (quoting *Bergeron*, 105 Wn.2d at 15). Thus, the State needed only to prove Cuzzetto's intent to commit any crime, not his specific intent to commit forgery or specific intent to commit theft against Allen Realtors. No unanimity instruction is required. Accordingly, there was no instructional error. *Bergeron*, 105 Wn.2d at 16.

Second, sufficient evidence in the record supports a finding that Cuzzetto intended to commit a crime when he possessed Friedrich's identity. When intent is an element of a crime, it

26

may be inferred through conduct and surrounding facts and circumstances. *Vasquez*, 178 Wn.2d at 8. Here, the record shows that Cuzzetto presented himself as Friedrich to Allen Realtors and law enforcement. The record also shows that Cuzzetto used Friedrich's personal information, including his date of birth, social security number, and driver's license number, unbeknownst to Friedrich, to fill out and submit a lease application. Thus, a jury could reasonably infer from the evidence that Cuzzetto used Friedrich's identity to forge, or fraudulently complete and submit, the lease application, which is a crime under RCW 9A.60.020.

Similarly, intent to commit theft from Allen Realtors may also be reasonably inferred from the evidence. The rental house cost over $3,800 per month. There is evidence in the record that Johnson and Andrews often had trouble paying their share of the rent. Both Cuzzetto and Andrews had evictions in their records. The record also shows that Allen Realtors would not have rented to individuals who had been subject to eviction actions. The fact that Cuzzetto impersonated Friedrich, who did not have an eviction on his record, implies that Cuzzetto was aware Allen Realtors would reject an application from Cuzzetto and/or Andrews based on their rental history. The record also shows that Cuzzetto created fake pay stubs from Microsoft demonstrating an income stream that did not exist. Furthermore, Cuzzetto failed to make a whole rental payment from the beginning. Indeed, he stopped responding to Fish after she started inquiring about the rent. A reasonable juror could infer that Cuzzetto knew that he, Friedrich, Andrews, and Johnson would not be able to afford the rental house. Thus, Cuzzetto's decision to engage with Allen Realtors for the rental house amounted to a form of theft. *See generally* RCW 9A.56.020.

Because identity theft is a statutory offense and the plain language requires only that the State prove intent to commit any crime, not a specific crime, and because the to-convict

instructions for identity theft accurately stated the law, we hold there was no instructional error. Furthermore, the record contains sufficient evidence that Cuzzetto intended to commit any crime when he possessed Friedrich's identity. Thus, we affirm Cuzzetto's conviction for identity theft.

CONCLUSION

We affirm Cuzzetto's conviction for first degree identity theft. However, we reverse Cuzzetto's convictions for second degree theft and forgery, and we remand this case to the trial court to proceed consistent with this opinion.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Maxa, J.

Veljacic, A.C.J.

28